## UNITED STATED DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

METROCITY HOLDINGS LLC,          Case No.:_____

      Plaintiff,

      v.

BANK OF AMERICA, N.A.,

      Defendant.

_____/

### COMPLAINT

Plaintiff Metrocity Holdings, LLC (the "Plaintiff" or "Metrocity") brings this Complaint against Bank of America, N.A. ("Bank of America") and alleges:

### INTRODUCTION

1.      The Plaintiff loaned millions of dollars to South Aviation, Inc. ("South Aviation") in connection with several purported aircraft purchase and finance transactions.  In each instance, the loan proceeds were deposited into a trust/escrow account maintained by Wright Brothers Aircraft Title, Inc. ("Wright Brothers") at Bank of America, and were only to be disbursed in accordance with strict escrow requirements contained in certain escrow agreements entered into between the Plaintiff and Wright Brothers.

2.      In making the loans and specifically using Wright Brothers (and its trust/escrow account at Bank of America) as the escrow agent, Plaintiff reasonably relied on several material representations made by Bank of America regarding both Wright Brothers and the balances that Wright Brothers allegedly maintained in its Bank of America trust/escrow account, which representations Plaintiff later learned were materially false and misleading.  Importantly, Bank of America issued several "balance verification letters" that confirmed average balances in the Wright

Brothers' trust/escrow account that contained materially false and misleading factual information that Plaintiff reasonably relied upon in proceeding with the loans.  In connection with its due diligence, Plaintiff even verified the authenticity and accuracy of such balance verification letters with a senior bank officer at Bank of America.

3.      In the end, the Plaintiff was defrauded out of $29 million because it reasonably relied on Bank of America's materially false and misleading representations about both the trust/escrow account and Wright Brothers when, unbeknownst to the Plaintiff, Wright Brothers, its principals and co-conspirators were engaged in a massive "Ponzi" scheme over a period of years using the trust/escrow account at Bank of America.  In fact, the principals of Wright Brothers and South Aviation were recently indicted in the Eastern District of Texas in connection with the "Ponzi" scheme on charges including conspiracy to commit wire fraud, conspiracy to commit money laundering, and narcotics trafficking.

4.      Wright Brothers held itself out to the world and to Plaintiff as being in the business of providing title, closing and escrow services for aircraft purchase and finance transactions.  Bank of America was fully aware of the services that Wright Brothers provided to its clients based on, among other things, Bank of America's longstanding, profitable relationship with Wright Brothers.  Escrow agents in the aircraft industry are entrusted with safeguarding very substantial amounts of escrow funds, and owe fiduciary duties to the other parties to the escrow agreement.  In connection with that purported business, since at least 2002, Wright Brothers maintained a trust/escrow account at Bank of America (the "Trust Account") that was used to deposit and hold escrow funds of its clients, like Plaintiff, in connection with aircraft purchase and finance transactions.  Because Bank of America opened, labeled and described the Trust Account as a "trust" account, Bank of

America knew that Wright Brothers owed a fiduciary duty to any Wright Brothers' client, like the Plaintiff, who deposited escrow funds into the Trust Account.

5.      Bank of America is a multinational investment bank and financial services company that purports to have expertise in maintaining escrow and trust accounts. Wright Brothers used the Trust Account to hold funds deposited by Plaintiff and other third party clients (the "Trust Account Depositors") in connection with purported aircraft purchase and finance transactions.  The purpose of the Trust Account was to assure depositors like Plaintiff that their funds would be secure and safeguarded until the closing or other termination of such transactions.  Wright Brothers misappropriated the funds in the Trust Account in effectuating its "Ponzi" scheme and as a result defrauded the Plaintiff.

6.      Since at least 2015, Bank of America issued numerous letters on behalf of Wright Brothers that assured prospective Trust Account Depositors, including Plaintiff, that Wright Brothers was a stable, solvent, and well-respected entity with a strong banking history and the financial ability to meet its obligations, and that could be trusted to serve as a disinterested escrow agent.  Certain of the letters (the "Comfort Letters") described (i) the longstanding and "strong" banking relationship that Bank of America enjoyed with Wright Brothers for approximately 14–17 years, (ii) the "excellent" standing of Wright Brothers' accounts at Bank of America, and (iii) that Wright Brothers was a "well respected aviation title company."  Bank of America knew and intended that such Comfort Letters issued for and on behalf of Wright Brothers would, and did, impart to Wright Brothers an appearance and reputation for trustworthiness and legitimacy.

7.      In addition to the Comfort Letters and the assurances contained therein, Bank of America went even further and provided several letters that contained specific factual information about Wright Brothers' Trust Account, including the average balance in the Trust Account over a

specified period of time and the dollar amounts of relevant transactions that passed through the Trust Account over a specified period of time (the "Balance Verification Letters"). Bank of America intended, knew and understood that such Balance Verification Letters issued for and on behalf of Wright Brothers would be used by Wright Brothers to induce, entice and provide assurances to Wright Brothers' clients, namely Plaintiff, who were considering whether to engage in transactions with Wright Brothers that involved the deposit of millions of dollars into the Trust Account.

8.     In fact, the information that Bank of America included in the Comfort Letters and the Balance Verification Letters is exactly the type of information that a reasonable person would consider important and rely upon when deciding whether to trust and deposit millions of dollars with Wright Brothers. Bank of America knew that the Plaintiff was relying on the Comfort Letters and the Balance Verification Letters in entering into escrow transactions with Wright Brothers.

9.     In fact, the Plaintiff specifically requested that Wright Brothers provide the Balance Verification Letters to enable Plaintiff to make an informed decision about whether to deposit millions of dollars in the Trust Account in connection with specific transactions. Moreover and importantly, Plaintiff independently verified the authenticity and accuracy of the Balance Verification Letters with a Bank of America senior bank officer. To that end, a representative of Plaintiff in Florida contacted the Bank of America representative who signed certain of the Balance Verification Letters and explained to that representative who Plaintiff was, that Plaintiff was about to engage in a transaction with Wright Brothers, that Plaintiff had received a Balance Verification Letter signed by such representative, and that Plaintiff wanted to verify that such Balance Verification Letter was issued by Bank of America and that its contents were accurate. Bank of America, through such representative, provided verbal confirmation that such Balance Verification

4

Letter was authentic and that its contents were accurate.  The same Bank of America representative later confirmed a second time to a representative of Plaintiff that at least two of the Balance Verification Letters that she had signed were authentic and contained accurate information.

10.     In reliance upon the information contained in the Comfort Letters and the Balance Verification Letters provided by Bank of America, Plaintiff deposited millions of dollars into the Wright Brothers' Trust Account to be used to finance transactions involving the purchase and sale of commercial aircrafts. In connection therewith, Plaintiff entered into escrow agreements with Wright Brothers as escrow agent, which provided for such funds to be deposited and maintained in escrow in the Trust Account with strict limitations on disbursements therefrom.

11.     BOA had a duty to Plaintiff to provide truthful information in the Comfort Letters and the Balance Verification Letters when BOA decided to prepare and issue them.  However, as detailed below, the Comfort Letters contained misleading and false information about Wright Brothers and certain of the Balance Verification Letters (including the ones directly verified by Plaintiff with Bank of America) contained materially false and misleading information provided by Bank of America in respect of the balances in the Trust Account which Bank of America knew was materially false or was willfully blind thereto.  In addition, the Comfort Letters and Balance Verification Letters omitted material information that Bank of America knew or was willfully blind to the fact that such omissions were materially misleading when it prepared and issued them.

12.     In deciding to enter into the escrow agreements with Wright Brothers and deposit millions of dollars into the Wright Brothers' Trust Account, Plaintiff reasonably relied upon the Comfort Letters and the Balance Verification Letters that Bank of America provided in coming to the conclusions that (i) Wright Brothers was a legitimate, reliable, well-respected, trustworthy, and creditworthy escrow agent, (ii) Wright Brothers had substantial average account balances in the

Trust Account and had engaged in substantial aviation transactions, and (ii) its funds would be secure, protected and fully refundable only to Plaintiff.

13.     By issuing the Comfort Letters and the Balance Verification Letters, and by separately verifying them to Plaintiff, Bank of America not only caused Plaintiff to deposit its money into the Trust Account, but also enabled and substantially assisted Wright Brothers, in a conspiracy with others, to effectuate and perpetuate their fraudulent scheme to steal Plaintiff's escrow funds from the Trust Account. As Plaintiff only later learned, the transactions that it entered into with South Aviation and Wright Brothers to finance aircraft purchase and sale transactions did not actually involve real sellers or potential buyers or, in some instances, real aircraft.  Bank of America's actions, misrepresentations and omissions supplied the façade that the purported aircraft transactions were real, that Wright Brothers was legitimate and trustworthy and that Plaintiff's escrow funds were safe and secure, which reasonably caused Plaintiff to deposit $29 million into the Trust Account only to be stolen by Wright Brothers, its principals and other co-conspirators.

14.     The crux of the fraud committed by Wright Brothers, its principals and other co-conspirators was in persuading Plaintiff that its funds would be protected and fully refundable to Plaintiff as required by the escrow agreements because Wright Brothers was a legitimate, experienced, and trustworthy entity.  By issuing the Comfort Letters and the Balance Verification Letters and verifying the accuracy of certain of them directly to Plainitff, Bank of America provided those very assurances that persuaded Plaintiff to place millions of dollars in the Bank of America Trust Account, $29,000,000 of which was stolen by fraudsters, who Bank of America had represented to be reputable and "well-respected."

## PARTIES, JURISDICTION AND VENUE

15.     Metrocity Holdings, LLC is a limited liability company organized and existing under the laws of the State of Wyoming with its principal place of business at 1910 Thomas Avenue, Cheyenne, WY 82001. Metrocity is a citizen of Florida through its sole member, Nathan Saks, who is a citizen of Florida and who resides in Palm Beach County, Florida.

16.     Bank of America, N.A. is incorporated in the state of Delaware and has its principal place of business at 100 North Tryon Street, Charlotte, North Carolina, making it a citizen of North Carolina. At all times material to this action, Bank of America operated hundreds of financial centers and ATMs throughout Florida, and otherwise engaged in substantial and not isolated business activity within Florida.

17.     This Court has jurisdiction over the parties and subject matter of the action pursuant to 28 U.S.C. § 1332(a).

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### I.     <u>The Ponzi Scheme</u>

19.     On February 26, 2021, in a case styled *United States v. Debra Lynn Mercer-Erwin*, et al., Case No. 4:20-CR-212, in the Eastern District of Texas, the United States government unsealed a Third Superseding Indictment charging Debra Mercer-Erwin ("<u>Mercer-Erwin</u>") and others with conspiracy to commit money laundering, conspiracy to commit wire fraud, aircraft registration violations, and conspiracy to distribute narcotics.   Mercer-Erwin was indicted specifically in connection with her conduct as the owner/operator of Wright Brothers.

20.     Subsequently, the United States government filed a Fifth Superseding Indictment (the "<u>Indictment</u>") alleging that Mercer-Erwin had conspired to perpetrate a "Ponzi" scheme

through Wright Brothers in connection with accepting escrow deposits related to the putative purchase and sale of commercial aircraft.

21.     The Indictment also identified Federico Andres Machado ("Machado"), an individual residing at all relevant times in Florida, as a co-conspirator of Mercer-Erwin. Machado was the owner/operator of South Aviation, which operated in Florida as a broker for third-party buyers of aircraft, and held itself out as the putative buyer in aircraft transactions conducted through Wright Brothers. Machado, Mercer-Erwin, and their other co-conspirators are collectively referred to herein as the "Fraudsters."

22.     As detailed in the Indictment, the Fraudsters used fraudulent or fictitious buyers, including South Aviation, to entice individuals and entities – including Plaintiff –  into depositing millions of dollars into the Trust Account maintained by Wright Brothers at Bank of America.

23.     After escrow funds were deposited into the Trust Account, such funds were not kept in the Trust Account as required by the escrow agreements related thereto.  Instead, the escrow funds were improperly diverted by the Fraudsters to Machado or Machado-designated entities, including to repay amounts owed to other parties who had deposited monies into the Trust Account and who needed to be repaid.  In many instances and unbeknownst to Plaintiff, the escrow monies were transferred out of the Trust Account on the same day they were deposited or the very next day, in a manner wholly inconsistent with traditional escrow arrangements, but wholly consistent with fraud and money laundering.

24.     As detailed in the Indictment, the Fraudsters entered into agreements and transactions in connection with the supposed purchase and sale of commercial aircraft as part of the "Ponzi" scheme, which generally consisted of the following four steps:

a.      Step 1:  The Trust Account Depositor [*i.e.,* Plaintiff] agreed to provide the fraudulent buyer [South Aviation] with a refundable deposit, which the fraudulent buyer purported would be used as security for a loan to purchase an aircraft.  After accepting the deposit, the fraudulent buyer then owed interest to the Trust Account Depositor.

b.      Step 2:  The fraudulent buyer [South Aviation] then designated a trust account to hold in escrow the Trust Account Depositor's money, and the fraudulent buyer always selected an escrow account controlled by the Fraudsters [ie. the Trust Account].

c.      Step 3: The terms of the escrow agreements required that the Trust Account Depositor's [*i.e.*, the Plaintiff's] money be fully refunded from the Trust Account unless the putative buyer successfully completes an inspection of the aircraft by a date certain. Notwithstanding the terms of the escrow agreements, including the fact that no inspection took place, the Fraudsters did not refund the Trust Account Depositor's money.  Instead, the Fraudsters stole the funds for their own purposes.

d.      Step 4: The fraudulent buyer [South Aviation] then secured another deposit from another Trust Account Depositor for the purported purchase of a different aircraft.  This deposit was then used in part to pay the principal and interest owed to the previous Trust Account Depositor for the previous fraudulent aircraft transaction.  This "Ponzi" cycle continued until the unsealing of the Indictment, at which point Plaintiff suffered its losses.

II.      **Bank of America's Role in the Fraud Committeed Against the Plaintiff**

a.   **Wright Brothers' Trust Account with Bank of America**

25.      The Fraudsters defrauded the Plaintiff by convincing Plaintiff to deposit funds in the Bank of America Trust Account and that such funds would be safe and secure, and refunded to Plaintiff in accordance with the terms of the escrow agreements between Wright Brothers and Plaintiff.

26.     Wright Brothers enjoyed a longstanding relationship with Bank of America going back to at least August 2, 2002.  On that date, Mercer-Erwin executed corporate signature cards for two Wright Brothers business bank accounts: (1) the Operating Account (that is, "Wright Brothers Aircraft Title, Inc. Operating Account," ending in *9081); and (2) the Trust Account (that is, "Wright Brothers Aircraft Title, Inc. Trust Account," ending in *9094).  The signature card and all the bank statements associated with the Trust Account clearly identify it as a "trust account."

27.     Importantly, a trust account is different from a typical "demand deposit account," where funds can be withdrawn at will by the account holder.  At all relevant times, Bank of America knoew that a trust account is designed and intended to provide a safe and reliable mode of securing deposited funds until certain agreed-upon conditions are satisfied, usually in the form of an escrow agreement.  An escrow agent, like Wright Brothers in the present case, owes a fiduciary duty to the depositor, like Plaintiff here, to keep the escrowed funds secure until the fulfillment of the conditions of the transactions as clearly set forth in the escrow agreements.

28.     In the present case, Wright Brothers owed fiduciary duties to Plaintiff as a result of being an escrow agent.  The escrow agreements between Plaintiff and Wright Brothers contained strict conditions as to when and to whom the escrow funds could be disbursed.   Specifically, the Trust Account was supposed to hold Plaintiff's funds until the inspection of the aircraft and other steps related to the putative aircraft purchase transaction were completed.  Following satisfaction of such conditions, Wright Brothers had a fiduciary duty to Plaintiff to disburse the escrowed funds only as directed by the escrow agreement.

29.     Bank of America earned fees and other substantial consideration from maintaining the Operating Account and the Trust Account over the course of many years.  To that end, billions

of dollars passed through the Trust Account during the long standing relationship between Bank of America and Wright Brothers.

> **b.    Plaintiff's Loans to South Aviation and the Escrow Agreements with Wright Brothers.**

30.    From 2016 through 2018, Everstrong Holdings, LLC ("Everstrong"), a Wyoming limited liability company and an entity affiliated with Plaintiff, entered into a series of loans and purported aircraft finance transactions with South Aviation as the borrower and also putative buyer of aircraft.  The proceeds of such loans were deposited into the Bank of America Trust Account of Wright Brothers as the putative escrow agent.  The sole member and sole manager of Everstrong at all times was Nathan Saks ("Mr. Saks"), who is also the sole member and sole manager of Plaintiff.

31.    Among other previous loans, on August 31, 2018, Everstrong made a loan to South Aviation in the original principal amount of $6,000,000 pursuant to the terms of a certain Promissory Note from South Aviation to Everstrong, dated August 31, 2018 (the "August 2018 Loan").  The proceeds of the August 2018 Loan were deposited into the Bank of America Trust Account of Wright Brothers pursuant to the terms of two certain Escrow Agreements of even date therewith (the "August 2018 Escrow Agreements"), each in the amount of $3.0 million.  The August 2018 Escrow Agreements were entered into in connection with the purported purchase of two aircraft pursuant to the terms of two certain Aircraft Purchase and Sale Agreements, each dated August 30, 2018.

32.    The August 2018 Loan had a maturity date of March 1, 2019.  On March 1, 2019, the outstanding principal balance of the August 2018 Loan was repaid.

33.    Beginning in October 2018, Mr. Saks decided to use Metrocity, which is and was an entity wholly owned by him, in place of Everstrong to make a series of additional loans for

purported aircraft finance transactions with South Aviation as the borrower and also putative buyer of aircraft.  The proceeds of the Metrocity loans (like the proceeds of the Everstrong loans) originated in Florida and were deposited into the Bank of America Trust Account of Wright Brothers as the putative escrow agent.

34.     Specifically, on October 1, 2018, Metrocity made a loan to South Aviation in the original principal amount of $9,000,000 pursuant to the terms of a certain Promissory Note from South Aviation to Metrocity, dated October 1, 2018 (the "October 2018 Loan").  The proceeds of the October 2018 Loan were deposited into the Bank of America Trust Account of Wright Brothers pursuant to the terms of three certain Escrow Agreements of even date therewith, each in the amount of $3.0 million (the "October 2018 Escrow Agreements").  The October 2018 Escrow Agreements were entered into in connection with the purported purchase of three aircraft pursuant to the terms of three certain Aircraft Purchase and Sale Agreements, each dated October 1, 2018.

35.     The October 2018 Loan had a maturity date of April 1, 2019.  At the request of South Aviation and Machado, the October 2018 Loan was renewed by and through a certain Renewal Promissory Note, dated April 1, 2019, which established a new maturity date of July 1, 2019.  In connection therewith, the October 2018 Escrow Agreements were also amended to reflect such renewal.  Thereafter, the outstanding principal balance of the October 2018 Loan was repaid.

36.     On October 12, 2018, Metrocity made a loan to South Aviation in the original principal amount of $9,000,000 pursuant to the terms of a certain Promissory Note from South Aviation to Metrocity, dated October 12, 2018 (the "Second October 2018 Loan").  The proceeds of the Second October 2018 Loan were deposited into the Bank of America Trust Account of Wright Brothers pursuant to the terms of three certain escrow agreements of even date therewith (the "Second October 2018 Escrow Agreements"), each in the amount of $3.0 million.  The Second

October 2018 Escrow Agreements were entered into in connection with the purported purchase of three aircraft pursuant to the terms of three certain Aircraft Purchase and Sale Agreements, each dated October 12, 2018.

37.     The Second October 2018 Loan had a maturity date of April 11, 2019.  At the request of South Aviation and Machado, the Second October 2018 Loan was renewed on several occasions.  Namely, the Second October 2018 Loan was renewed by and through a certain Renewal Promissory Note, dated April 11, 2019, which established a new maturity date of July 11, 2019. The Second October 2018 Loan was further renewed by and through a certain Renewal Promissory Note, dated July 11, 2019, which established a new maturity date of August 11, 2019.  The Second October 2018 Loan was further renewed by and through a certain Renewal Promissory Note, dated August 11, 2019, which established a new maturity date of December 11, 2019.  In connection therewith, the Second October 2018 Escrow Agreements were amended to reflect such renewals. The outstanding principal balance of the Second October 2018 Loan was repaid.

38.     On May 7, 2019, Metrocity made a loan to South Aviation in the original principal amount of $5,000,000 pursuant to the terms of a certain Promissory Note from South Aviation to Metrocity, dated May 7, 2017 (the "May 2019 Loan").  The proceeds of the May 2019 Loan were deposited into the Bank of America Trust Account of Wright Brothers pursuant to the terms of a certain Escrow Agreement of even date therewith (the "May 2019 Escrow Agreement").  The May 2019 Escrow Agreement was entered into in connection with the purported purchase of a certain aircraft pursuant to the terms of a certain Aircraft Purchase and Sale Agreement, dated May 7, 2019.

39.     The May 2019 Loan had a maturity date of August 7, 2019.  Thereafter, the outstanding principal balance of the May 2019 Loan was repaid.

40.     On August 6, 2019, Metrocity made a loan to South Aviation in the original principal amount of $15,000,000 pursuant to the terms of a certain Promissory Note from South Aviation to Metrocity, dated August 6, 2019 (the "August 2019 Loan").  The proceeds of the August 2019 Loan were deposited into the Bank of America Trust Account of Wright Brothers pursuant to the terms of three certain escrow agreements of even date therewith (the "August 2019 Escrow Agreements"), each in the amount of $5.0 million.  The August 2019 Escrow Agreements were entered into in connection with the purported purchase of three aircraft pursuant to the terms of three certain Aircraft Purchase and Sale Agreements, each dated August 6, 2019.

41.     The August 2019 Loan had a maturity date of February 6, 2020.  At the request of South Aviation and Machado, the August 2019 Loan was renewed by and through a certain Renewal Promissory Note, dated February 6, 2020, which established a new maturity date of August 6, 2020.  In connection therewith, the August 2019 Escrow Agreements were amended to reflect such renewal.  Thereafter, the outstanding principal balance of the August 2019 Loan was repaid.

42.     On August 12, 2019, Metrocity made a loan to South Aviation in the original principal amount of $5,000,000 pursuant to the terms of a certain Promissory Note from South Aviation to Metrocity, dated August 12, 2019 (the "Second August 2019 Loan").  The proceeds of the Second August 2019 Loan were deposited into the Bank of America Trust Account  of Wright Brothers pursuant to the terms of a certain escrow agreement of even date therewith (the "Second August 2019 Escrow Agreement").  The Second August 2019 Escrow Agreement was entered into in connection with the purported purchase of a certain aircraft pursuant to the terms of a certain Aircraft Purchase and Sale Agreement, dated August 12, 2019.

43.     The Second August 2019 Loan had a maturity date of February 12, 2020.  At the request of South Aviation and Machado, the Second August 2019 Loan was renewed by and through a certain Renewal Promissory Note, dated February 12, 2020, which established a new maturity date of August 12, 2020.  In connection therewith, the Second August 2019 Escrow Agreement was amended to reflect such renewal.  On August 7, 2020, the outstanding principal balance of the Second August 2019 Loan was repaid.

44.     On December 13, 2019, Metrocity made a loan to South Aviation in the original principal sum of $9,000,000 pursuant to the terms of a certain Promissory Note from South Aviation to Metrocity, dated December 13, 2019 (the "December 2019 Loan").  The proceeds of the December 2019 Loan were deposited into the Bank of America Trust Account of Wright Brothers pursuant to the terms of two certain escrow agreements of even date therewith (the "December 2019 Escrow Agreements"), each in the amount of $4.5 million.  The December 2019 Escrow Agreements were entered into in connection with the purported purchase of two aircraft pursuant to the terms of two certain Aircraft Purchase and Sale Agreements, each dated December 13, 2019.

45.     The December 2019 Loan had a maturity date of June 13, 2020.  At the request of South Aviation and Machado, the December 2019 Loan was renewed by and through a certain Renewal Promissory Note, dated June 13, 2020, which established a new maturity date of December 13, 2020.  The December 2019 Loan was further renewed and extended pursuant to the terms of a certain Renewal Promissory Note, dated December 13, 2020, which extended the maturity date of the December 2019 Loan to March 13, 2021.  In connection therewith, the December 2019 Escrow Agreements were amended to reflect such renewals.  South Aviation

defaulted on the December 2019 Loan by failing to pay the amounts due thereunder on the maturity date.

46.     On August 14, 2020, Metrocity made a loan to South Aviation in the original principal sum of $20,000,000 pursuant to the terms of a certain Promissory Note from South Aviation to Metrocity, dated August 14, 2020 (the "August 2020 Loan").  The proceeds of the August 2020 Loan were deposited into the Bank of America Trust Account of Wright Brothers pursuant to the terms of four certain escrow agreements of even date therewith (the "August 2020 Escrow Agreements"), each in the amount of $5.0 million.  The August 2020 Escrow Agreements were entered into in connection with the purported purchase of four aircraft pursuant to the terms of four certain Aircraft Purchase and Sale Agreements, each dated August 14, 2020.

47.     The August 2020 Loan had a maturity date of December 14, 2020.  At the request of South Aviation and Machado, the August 2020 Loan was renewed by and through a certain Renewal Promissory Note, dated December 14, 2020, which established a new maturity date of April 14, 2021.  In connection therewith, the August 2020 Escrow Agreement was amended to reflect such renewal.  South Aviation defaulted on the August 2020 Loan by failing to pay the amounts due thereunder on the maturity date.

48.     In connection with the December 2019 Loan and the August 2020 Loan, Plaintiff entered into the following escrow agreements with Wright Brothers, each of which referred to a specific aircraft by Manufacturer Serial Number ("MSN").  (*E.g.,* "Escrow Agreement re MSN 38288" ) (collectively, the "Escrow Agreements"):

   a.      December 13, 2019 Metrocity escrow agreement re: MSN 35160

   b.      December 13, 2019 Metrocity escrow agreement re: MSN 35162

   c.      August 14, 2020 Metrocity escrow agreement re: MSN 29062

      d.      August 14, 2020 Metrocity escrow agreement re: MSN 29157

      e.      August 14, 2020 Metrocity escrow agreement re: MSN 29908

      f.      August 14, 2020 Metrocity escrow agreement re: MSN 30214

49.      Under the terms of the Escrow Agreements, Wright Brothers was defined as the "Escrow Agent."

50.      Among other things, Wright Brothers agreed "to hold, invest, and disburse all funds received from or on behalf of the Depositor" in accordance with the terms of the Escrow Agreements.

51.      Importantly, each Escrow Agreement provided that unless Plaintiff signed a joinder and its counsel provided written confirmation by a date certain in connection with the closing of a sale of the applicable aircraft, then the escrow funds were required to be refunded to Plaintiff.

52.      Pursuant to the Escrow Agreements, Plaintiff wired a total of $29,000,000 to the Trust Account controlled by Wright Brothers and maintained by Bank of America.

53.      In violation of the Escrow Agreements and its fiduciary duties owed to Plaintiff, Wright Brothers, in concert with the Fraudsters, converted the $29 million in escrow funds deposited by Plaintiff in the Trust Account.

### c.   Bank of America's Materially False and Misleading Letters

54.      Prior to Plaintiff entering into the December 2019 Loan and the August 2020 Loan and corresponding Escrow Agreements, among others, Plaintiff, through Mr. Saks, received certain of the Comfort Letters and the Balance Verification Letters described below provided by Bank of America that contained materially false and misleading information about Wright Brothers and the Trust Account that Bank of America knew or was willfully blind to the fact that such information was materially false and misleading.  The Comfort Letters and the Balance Verification Letters also omitted material information about Wright Brothers and the Trust Account that Bank of

17

America knew or was willfully blind to the fact that such omissions made such letters false and misleading.

55.    Banks, in their course of their business, issue letters such as the Comfort Letters and the Balance Verification Letters to banking clients to provide assurance to third-parties that are considering doing business with the bank's customer.

56.    Plaintiff relied upon such Comfort Letters and such Balance Verification Letters in deciding to enter into the loans described above, including in particular entering into the Escrow Agreements with Wright Brothers as escrow agent for the December 2019 Loan and the August 2020 Loan, and in deciding to deposit of millions of dollars into the Trust Account as part of what Plaintiff believed were a series of legitimate financing transactions with Machado and South Aviation.

57.    At Plaintiff's request to Wright Brothers, Bank of America furnished Wright Brothers with multiple Comfort Letters and Balance Verification Letters intended and designed to provided assurances to Plaintiff in respect of the legitimacy and trustworthiness of Wright Brothers and of the balances in the Trust Account.  As Plaintiff later learned, the Comfort Letters and the Balance Verification Letters provided to Plaintiff contained materially false information, dramatically misrepresented material information and omitted material information about Wright Brothers and its accounts, including specifically the Trust Account.

58.    Certain of these Comfort Letters and Balance Verification Letters were critically important to Plaintiff in deciding whether to proceed with the proposed transactions with South Aviation and Wright Brothers.  Specifically and among other things, knowing the average collected balances in, and volume of funds passing through, the Trust Account enabled Plaintiff to confirm

that the Trust Account was secure and contained the escrow funds previously deposited by Plaintiff, which in turn further signified a legitimate aircraft title and escrow operation.

59.     By providing these Comfort Letters and Balance Verification Letters, Bank of America cloaked the Fraudsters with legitimacy and enabled them to gain Plaintiff's confidence and trust, with the end goal of stealing millions of dollars from Plaintiff.

60.     The Plaintiff foreseeably and reasonably relied on Bank of America's factual representations and assurances in the Comfort Letters and the Balance Verification Letters in deciding whether to proceed with the proposed transactions with Wright Brothers detailed above, including the December 2019 Loan and the August 2020 Loan.

61.     Bank of America knew that Wright Brothers was providing the Comfort Letters and the Balance Verification Letters to potential lenders and/or transaction parties, including specifically Plaintiff, and that the potential lenders and/or transaction parties, including specifically Plaintiff, were relying on them to proceed with their respective transactions.  As a result, Bank of America had a duty and an obligation to Plaintiff to insure that the information it included in the Comfort Letters and the Balance Verification Letters was complete, accurate and truthful.

62.     Bank of America maintains policies and procedures, including its anti-money laundering compliance program, that provide information to Bank of America in connection with drafting, reviewing, and issuing letters such as the Comfort Letters and the Balance Verification Letters so as to ensure that the information they contain is complete, accurate and truthful.

**<u>AUGUST 2015 LETTER</u>**

63.     On August 20, 2015, Bank of America Vice President and Business Banking Client Manager Brandon G. Ellis ("<u>Ellis</u>"), provided Wright Brothers with a letter (the "<u>August 2015 Letter</u>") addressed to "Whom it May Concern," "regarding the relationship between Wright

Brothers Aircraft Title, Inc. and Bank of America," in which Bank of America assured the readers of the letter—i.e., Plaintiff—that:

> Wright Brothers Aviation Title, Inc. has maintained a **strong banking relationship** with Bank of America and its predecessors for the past 14 years. All of their **accounts are in excellent standing**. Wright Brothers Aviation Title has authorized me to tell you that over $380MM dollars in aviation transactions have passed through their accounts in the past 6 months, annualizing at over $760MM. We have never received a complaint having to do with the services they provide to their clients.

(Emphasis added).

64.     Everstrong, through Mr. Saks, received and relied on the August 2015 Letter in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

65.     Plaintiff, through Mr. Saks, also relied on the August 2015 Letter, as well as all of the other Bank of America letters described herein that were delivered to him at all relevant times, in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, including the December 2019 Loan and the August 2020 Loan, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

66.     A correct copy of the August 2015 Letter is attached as Exhibit A.

## DECEMBER 2015 LETTER

67.     On December 7, 2015, Bank of America Vice President Ellis issued another letter

on Bank of America's behalf for Wright Brothers addressed "To Whom It May Concern" (the

"December 2015 Letter"), which represented as follows:

> I am pleased to furnish a letter of reference regarding the relationship between
> Wright Brothers Aircraft Title, Inc. and Bank of America.
>
> Wright Brothers Aviation Title, Inc. has maintained a **strong banking relationship**
> with Bank of America and its predecessors for the past 14 years.  **All of their
> accounts are in good standing**.  Wright Brothers Aviation Title has authorized me
> to tell you that over $320MM dollars in aviation transactions have passed through
> their accounts in the past 6 months, annualizing at over $640MM.
>
> If you have any additional questions regarding our relationship with this **respected
> aviation title company**, you may reach out to me directly.

(Emphasis added).

## JULY 2016 LETTER

68.     On July 5, 2016, Bank of America Senior Vice President and Business Banking

Relationship Manager Mark Fish ("Fish") represented in writing at the request of Mercer-Erwin

for Wright Brothers (the "July 2016 Letter"), that: "Wright Brothers Aircraft Title, Inc. has been a

customer of Bank of America Merrill Lynch since October 18, 2001 and has maintained an

**aggregate average collected deposit balance of $11,818,006.50 over the past twelve months**."

(Emphasis added). The July 2016 Letter was a Balance Verification Letter.

69.     The first page of each of the monthly account statements for the Wright Brothers'

Trust Account at Bank of America identifies the "average ledger balance" for that month.

70.     The "aggregate average collected deposit balance of $11,818,006.50" referenced in

the July 2016 Letter appears to have been calculated accurately based on the "average ledger

balance" for the months identified in the letter.

71.     Everstrong, through Mr. Saks, received and relied on the July 2016 Letter in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

72.     Plaintiff, through Mr. Saks, also relied on the July 2016 Letter, as well as all of the other Bank of America letters described herein that were delivered to him at all relevant times, in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, including the December 2019 Loan and the August 2020 Loan, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

73.     A correct copy of the July 2016 Letter is attached as Exhibit B.

## JANUARY 2017 LETTER

74.     On January 11, 2017, Bank of America Senior Vice President Fish provided another letter to Mercer-Erwin for Wright Brothers (the "January 2017 Letter"), stating: "Per your request, Wright Brothers Aircraft Title, Inc. has maintained an **aggregate average collected deposit balance of $11,648,172.00 over the past twelve months**." (Emphasis added). The January 2017 Letter was a Balance Verification Letter.

75.     The "aggregate average collected deposit balance of $11,648,172.00" referenced in the January 2017 Letter appears to have been calculated accurately based on the "average ledger balance" for the months identified in the letter.

76.     Everstrong, through Mr. Saks, received and relied on the January 2017 Letter in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

77.     Plaintiff, through Mr. Saks, also relied on the January 2017 Letter, as well as all of the other Bank of America letters described herein that were delivered to him at all relevant times, in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, including the December 2019 Loan and the August 2020 Loan, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

78.     A correct copy of the January 2017 Letter is attached as Exhibit C.

**APRIL 2017 LETTER**

79.     On April 27, 2017, Bank of America Senior Vice President Fish issued a third letter to Mercer-Erwin for Wright Brothers (the "April 2017 Letter"), stating: "Per your request, the total amount of all deposits made into the Wright Brothers Aircraft Title, Inc. Trust Account in calendar year 2016 was $405,612,916.62."

80.     A correct copy of the April 2017 Letter is attached as Exhibit D.

**FEBRUARY 2018 LETTER**

81.     On February 26, 2018, Elizabeth Haralson ("Haralson"), who was at that time a Relationship Manager in Bank of America's Business Banking Unit, issued a letter on behalf of Bank of America to Mercer-Erwin for Wright Brothers (the "February 2018 Letter"). The February

23

2018 letter is the first of several letters that Bank of America issued through Haralson that contain materially false and misleading representations and omissions.

82.     The February 2018 Letter states:

I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.

Wright Brothers Aviation Title, Inc. has maintained a **strong banking relationship with Bank of America** and its predecessors for the past 17 years.  All of their accounts are in excellent standing.  Wright Brothers Aviation Title has authorized me to tell you that **their average volume over the last 6 months has been $183MM**.  We have never received a complaint having to do with the services they provide to their clients.

If you have any additional questions regarding our relationship with this **well respected aviation title company**, you may reach out to me directly.

(Emphasis added).

83.     Bank of America's February 2018 Letter contained material misrepresentations about Wright Brothers and its account. While the letter represented that Wright Brothers' "average volume over the last 6 months [had] been $183MM," Bank of America's own bank statements show that, in reality, Wright Brothers had a *total*, not average, volume of $183 million in credits and deposits during that time period. The average amount in the account during the time period at issue was in fact around $31 million — *one-sixth* of the $183 million that Bank of America represented it to be in the February 2018 Letter.

84.     A correct copy of the February 2018 Letter is attached as Exhibit E.

## JANUARY 2019 LETTER

85.     On January 24, 2019, Haralson, who at the time of this letter had been promoted to a Vice President of Business Banking, issued another letter on behalf of Bank of America for Wright Brothers, this one addressed "To Whom It May Concern" (the "January 2019 Letter"), stating:

I am pleased to furnish a letter of reference regarding the relationship between Wright Brothers Aircraft Title, Inc. and Bank of America.

Wright Brothers Aviation Title, Inc. has **maintained a strong banking relationship with Bank of America** and its predecessors for the past 18 years.  All of **their accounts are in excellent standing**.  Wright Brothers Aviation Title has authorized me to tell you that over $257 MM dollars in aviation transactions have passed through their account in the past 6 months, annualizing at over $515 MM. We have never received a complaint having to do with the services they provide to their clients.

If you have any additional questions regarding our relationship with this **well respected aviation title company**, you may reach out to me directly.

(Emphasis added).

86.    A correct copy of the January 2019 Letter is attached as Exhibit F.

87.    Bank of America, through Haralson, once again misstated the factual information about Wright Brothers, materially misrepresenting that Wright Brothers was a "well respected aviation title company" when it was actually perpetrating a massive "Ponzi" scheme

88.    Everstrong, through Mr. Saks, received and relied on the January 2019 Letter in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

89.    Plaintiff, through Mr. Saks, also relied on the January 2019 Letter, as well as all of the other Bank of America letters described herein that were delivered to him at all relevant times, in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, including the December 2019 Loan and the August 2020 Loan, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

## MARCH 2019 LETTER

90.     On March 1, 2019, Haralson issued a third letter on behalf of Bank of America, this time in her capacity as *Senior* Vice President (the "March 2019 Letter"). The March 2019 Letter was another Balance Verification Letter to Mercer-Erwin, in which Bank of America stated, "Per your request, Wright Brothers Aircraft Title, Inc. has been a Bank of America customer since 10/2001 and has **maintained an average collected balance of $25,700,936.26 over the past six months**."   (Emphasis added).

91.     Importantly, the January 2017 Letter and April 2017 Letter issued by Mr. Fish calculated the "average collected balance" based on the average ledger balances identified in the bank account statements for the months at issue in those letters. The "average collected balance" for the time period referenced in the March 2019 Letter, when calculated using the same methodology as the January 2017 Letter and April 2017 Letter, is only $11,220,149.21, which is *less than half* of the average collected balance of $25,700,936.26 represented in the March 2019 Letter. Thus, according to the methodology that Bank of America used to calculate the average collected balances in the January 2017 Letter and April 2017 Letter, the March 2019 Letter materially overstates Wright Brothers' average account balance by $14,480,787.05 or almost 60%.

92.     Unlike the January 2017 Letter and April 2017 Letter issued by Mr. Fish, the March 2019 Letter issued by Haralson appears to adopt a new methodology to calculate the "average collected balance" that is not tied to the average ledger balances. Specifically, the average collected balance in the March 2019 letter appears to be calculated by adding the total deposits in the first and last month of the period referenced in the letter, and dividing by two. This methodology is not an accepted method by banks for calculating the average colleted balance in a bank account, and it contradicts Bank of America's own internal definition of the term "collected balance."

93.     The methodology for calculating the "average collected balance" used in the March 2019 Letter is materially misleading because it reflects large monthly deposits into the account, but masks the large withdrawals from the account, many of which were made from the account immediately after such deposits were made. Bank of America had actual knowledge of, or was willfully blind to, those immediate large withdrawals, because Bank of America reviewed the activity in the Trust Account to prepare the March 2019 Letter. Further, Bank of America knew that calculating the "average collected balance" based on the average ledger balances, as Bank of America had done in the January 2017 Letter and April 2017 Letter, would reveal the large withdrawals from the Trust Account by materially reducing the average collected balance identified in the March 2019 Letter from $25,700,936.26 to $11,220,149.21. Thus, Bank of America knew that its representation in the March 2019 Letter about the average collected balance in the Trust Account was materially misleading and omitted material information.

94.     A correct copy of the March 2019 Letter is attached as Exhibit G.

95.     Plaintiff specifically requested that Wright Brothers obtain the March 2019 Letter from Bank of America as a critical and important part of Plaintiff's diligence in deciding at that time whether to renew two prior loans and to fund additional loans to South Aviation using the Wright Brothers' Trust Account.

96.     Beyond obtaining the March 2019 Letter, on March 5, 2019, a representative of Plaintiff from Florida spoke on the phone with Haralson's assistant, Angela Parks, wherein he identified Plaintiff and explained that he wanted to confirm that the March 2019 letter and its contents were accurate.  During that phone call, Plaintiff's representative advised Ms. Parks that the letter was signed by Haralson and was provided to Plaintiff by Mercer-Erwin in connection with a proposed transaction between Plaintiff and Wright Brothers.  Plaintiff's representative

requested that Ms. Parks verify the accuracy of the amount identified in the letter as the average balance of Wright Brothers' account.  Ms. Parks put Plaintiff's representative on hold, and when she returned she represented that she spoke to Haralson, ***and confirmed to Plaintiff's representative that the March 2019 Letter was authentic and its contents were accurate.***  Ms. Parks also confirmed that the March 2019 letter had been drafted by or at the direction of Haralson, and that Haralson authorized the March 2019 Letter to be provided to Mercer-Erwin for her use with respect to prospective Trust Account Depositors like Plaintiff.  As a result of this phone call, Bank of America knew that Plaintiff was relying on the March 2019 Letter in deciding to allow existing funds to remain in the Trust Account and to deposit additional funds into the Trust Account.

97.     Importantly and specifically, in or about February 2019 at the time when Plaintiff was considering renewing the October 2018 Loan ($9.0 million), renewing the Second October 2018 Loan ($9.0 million) and making the May 2019 Loan ($5.0 million), Plaintiff wanted to insure that the escrow funds on deposit in the Trust Account in connection with those two existing loans remained in the Trust Account (along with the funds deposited therein in connection with the August 2018 Loan of Everstrong - $6.0 million, which had a maturity date of March 1, 2019).  In connection therewith, Plaintiff required verification from Bank of America that the Trust Account had at least $24 million on deposit therein for the prior six months.

98.     The March 2019 Letter, together with the telephone verification from Bank of America described above, confirmed and verified to Plaintiff that more than $24 million had been on deposit in the Trust Account for the past six months.  As a result, the information in the March 2019 Letter enabled Plaintiff to confirm that prior loan proceeds were safely held in escrow as had been agreed.  Indeed, the very purpose of the March 2019 Letter was to cause Plaintiff to allow

existing funds to remain in the Trust Account and to induce Plaintiff to continue funding money into the Bank of America Trust Account, in each case with respect to loans from Plaintiff to South Aviation using Wright Brothers as the escrow agent. If the March 2019 Letter from Bank of America had contained truthful and accurate information as to the true balance in the Trust Account, then Plaintiff would have learned that millions of dollars of its loan proceeds previously deposited into the Trust Account had been misappropriated.

99.    Plaintiff, through Mr. Saks, relied on the March 2019 Letter and the verbal representations made to Plaintiff's representative by Ms. Parks and Haralson described above, as well as all of the other Bank of America letters described herein that were delivered to him at all relevant times, in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, including the December 2019 Loan and the August 2020 Loan, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

## AUGUST 2019 LETTER

100.    On August 9, 2019, Senior Vice President Haralson provided a fourth letter, which was another Balance Verification Letter, at the request of Mercer-Erwin (the "August 2019 Letter"), stating: "Per your request, Wright Brothers Aircraft Title, Inc. has been a Bank of America customer since 10/2001 and has **maintained an average collected balance of $33,938,782.00 over the past six months**."  (Emphasis added).

101.    The August 2019 Letter calculated the "average collected balance" using the same misleading methodology that Haralson adopted in the March 2019 Letter. The "average collected balance" for the time period referenced in the August 2019 Letter, calculated using the

methodology used in the January 2017 Letter and April 2017 Letter, is only $5,664,940, Thus, according to the methodology that Bank of America used to calculate the average collected balances in the January 2017 Letter and April 2017 Letter, the August 2019 Letter materially overstated Wright Brothers' average account balance ***by more than $28 million or over 6 times the actual balance.***

102.    The methodology for calculating the "average collected balance" used in the August 2019 Letter is misleading because it reflects large monthly deposits into the account, but masks the large withdrawals from the account, many of which were made from the account immediately after such deposits were made. Bank of America had actual knowledge of, or was willfully blind to, those immediate large withdrawals, because Bank of America reviewed the activity in the Trust Account to prepare the August 2019 Letter. Further, Bank of America knew that calculating the "average collected balance" based on the average ledger balances, as Bank of America had done in the January 2017 Letter and April 2017 Letter, would reveal the large withdrawals from the Trust Account by materially reducing the average collected balance identified in the August 2019 Letter. Thus, Bank of America knew that its representation in the August 2019 Letter about the average collected balance in the Trust Account was materially misleading and omitted material information.

103.    A correct copy of the August 2019 Letter is attached as Exhibit H.

104.    Importantly and specifically, in or about late July and early August 2019 at the time when Plaintiff was considering renewing the Second October 2018 Loan ($9.0 million) and making the Second August 2019 Loan ($5 million), having just made the August 2019 Loan ($15 million), Plaintiff wanted to insure that the escrow funds on deposit in the Trust Account in connection with

the Second October 2018 Loan and August 2019 Loan (a total of $24 million) remained in the Trust Account.

105. The August 2019 Letter confirmed and verified to Plaintiff that more than $24 million had been on deposit in the Trust Account. As a result, the information in the August 2019 Letter enabled Plaintiff to confirm that prior loan proceeds were safely held in escrow as had been agreed. Indeed, the very purpose of the August 2019 Letter was to cause Plainitff to allow existing funds to remain in the Trust Account and to induce Plaintiff to continue funding money into the Bank of America Trust Account, in each case with respect to loans from Plaintiff to South Aviation using Wright Brothers as the escrow agent. If the August 2019 Letter from Bank of America had contained truthful and accurate information as to the balance in the Trust Account, then Plaintiff would have learned that millions of dollars of its loan proceeds previously deposited into the Trust Account had been misappropriated.

106. Plaintiff, through Mr. Saks, relied on the August 2019 Letter, as well as the representations made to Plaintiff's representative by Ms. Parks and Ms. Haralson described above, as well as all of the other Bank of America letters described herein that were delivered to him at all relevant times, in deciding to continue with and engage in loan and aircraft finance transactions with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, including the December 2019 Loan and the August 2020 Loan, in each case based on the false premise that the funds would be held there safely and securely under escrow agreements with Wright Brothers.

        **d.   Bank of America Once Again Confirmed to Plaintiff the Authenticity and Accuracy of Certain of the Balance Verification Letters Even Though They Were Materially False and Misleading**

107. On or about January 19, 2021, a representative of Plaintiff spoke to Haralson to confirm the accuracy and authenticity specifically of the March 2019 Letter and the August 2019

31

Letter that Bank of America Senior Vice President Haralson provided. Plaintiff's representative forwarded the March 2019 Letter and the August 2019 Letter to Haralson in connection with such discussions.  Upon receipt of the March 2019 Letter and the August 2019 Letter, **_Haralson herself represented that both letters were valid, authentic and accurate balance verification letters drafted by her or at her direction_**, and Haralson further confirmed that she authorized both letters to be provided to Mercer-Erwin for her use with respect to prospective and actual Trust Account Depositors, such as Plaintiff.

108.    Thus, Haralson issued at least four separate letters containing materially false factual representations concerning Wright Brothers' accounts and omitted material information in connection therewith, and on at least two separate occasions Haralson provided verbal assurances to the Plaintiff that the false letters were authentic and accurate.

### e.    Bank of America Knew or was Willfully Blind to the Fact that the Balance Verification Letters were Materially False and Misleading and Omitted Material Information

109.    As a matter of its policy and procedure, Bank of America's bank officers would have reviewed and confirmed the balances in the Trust Account before preparing, signing and issuing the Balance Verification Letters.  Moreover, applicable banking regulations required the bank officers at Bank of America to conduct such a review before issuing letters such as the Balance Verification Letters.  As such, Bank of America knew or was willfully blind to the fact that the information contained in the Balance Verification Letters was materially false and misleading and omitted material information, in particular the Balance Verification Letters signed by Haralson.

110.    As set forth above, the Balance Verification Letters issued by Haralson and relied upon by Plaintiff were materially false and misleading and omitted material information, in one case more than double the actual balance and in one case more than six (6) times higher than the

actual balance.  In preparing, signing and issuing such Balance Verification Letters, Bank of America knew or was willfully blind to the fact that the amounts represented therein were wildly false, misleading and omitted material information.

      **f.  Bank of America Either Knew of or was Willfully Blind to the Fraud, Conversion and Breach of Fiduciary Duty Being Committed by Wright Brothers in respect of the Trust Account**

111.   In reviewing the Trust Account in connection with preparing the Balance Verification Letters as well as the Comfort Letters, Bank of America either had actual knowledge of, or was willfully blind to, the fact that numerous suspicious and unusual transactions for an escrow account had taken place wherein escrow funds were deposited into the Trust Account and some of all of which was transferred out of the Trust Account in large round numbers on the same day or the next day, leading to the conclusion that money was being stolen from the Trust Account by the Fraudsters.  In fact, during 2019 and 2020, there were over 100 instances wherein large escrow deposits were made into the Trust Acccount and that same day or the next day some or all of such funds were immediately transferred out of the Trust Account.  Such transfers out of the Trust Account were inconsistent with traditional escrow arrangements, and were evidence of fraud, including money laundering.

112.   To that end, Bank of America at all material times was required to collect and monitor information about Wright Brothers pursuant to Bank of America's obligations under federal law, including through its anti-money laundering compliance program, which required Bank of America to understand what type of activity was, and was not, supposed to be occurring in the Wright Brothers' Trust Account.

113.   Specifically, upon opening the Wright Brothers' accounts and establishing a banking relationship with Mercer-Erwin, Bank of America was required to conduct due diligence

under the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.* (the "<u>Bank Secrecy Act</u>") and other federal laws, and to conduct ongoing diligence concerning the activity in the Wright Brothers' accounts. Bank of America was also required to subject the Trust Account to its anti-money laundering compliance program required to be in place pursuant to the Bank Secrecy Act.

114.     Congress enacted the Bank Secrecy Act to address an increase in criminal money laundering activities utilizing financial institutions. Pursuant to the Bank Secrecy Act, all banks are required to establish and maintain an anti-money laundering compliance program that includes: (a) the development of internal policies, procedures, and controls designed to guard against money laundering; (b) the designation of a compliance officer to coordinate and monitor day-to-day compliance with the Bank Secrecy Act and anti-money laundering requirements; (c) the establishment of an ongoing employee training program; and (d) the implementation of independent testing for compliance conducted by bank personnel or an outside party.

115.     An effective anti-money laundering program is risk-based and incorporates certain principles commonly referred to as Know Your Customer ("<u>KYC</u>").  KYC requires that banks know the true identity of its customers and its customers' business, including verification of the business and of the source of monies that come into the accounts, to monitor its customers' transactions to determine that a legitimate reason exists consistent with the business of the customer, for transfers in and out of the customers' accounts, and to determine if transactions are unusual or suspicious and, if so, to report those transactions to the proper authorities and close the accounts if appropriate.

116.     Certain bank customers, due to the nature of their business, services, and transaction activity, are more vulnerable to, or have historically been used as fronts by, money launderers and

criminals.  Financial institutions are required to conduct enhanced due diligence with effective policies, procedures and processes to deal with such customers.

117.    Trust accounts formed in private banking departments are a recognized scenario where enhanced due diligence is appropriate. At all material times, Bank of America had internal policies and procedures that required the application of enhanced due diligence to all trust accounts, including Wright Brothers' Trust Account.

118.    To comply with enhanced due diligence requirements, it is standard industry practice for banks, like Bank of America, to have an automated account monitoring system that examine transactions to identify the typical attributes of fraudulent transactions, including the common characteristics of transactions related to a Ponzi scheme.  A standard automated account monitoring system sends an alert each and every time there is a deposit, withdrawal, or any transaction with suspicious attributes.  Bank of America employs such an automated account monitoring system to detect suspicious or potentially fraudulent transactions like the transactions typically seen in Ponzi schemes, and that system should have generated an alert for each and every deposit, withdrawal or any transaction with suspicious attributes.

119.    In addition, given its long relationship with Wright Brothers, Bank of America knew the type of business conducted by Wright Brothers and the types of services offered by Wright Brothers to its clients, including without limitation, the deposit of millions of dollars into the Trust Account in connection with aviation escrow transactions.  Among other things, a simple search of the internet would have revealed that Wright Brothers held itself out to be "a full service title and escrow company located in Oklahoma City, Oklahoma.  We offer a full range of title and escrow services, based on our commitment to outstanding service and strong client relations." In addition, as set forth above, certain of the Comfort Letters provided by Bank of America referred

to "aviation transactions" conducted by Wright Brothers, and that Wright Brothers was a "well respected aviation title company."

120.    Dating back to at least 2016, the majority of transfers made by the Fraudsters in conducting the "Ponzi" scheme, particularly in months of the highest inflows and outflows, were made in monthly cycles in which the month commenced and ended with a relatively low balance when compared to the funds wired in and wired out of the Trust Account for that month. The activity in the Trust Account in August 2020 demonstrates this pattern, although the volume of funds that moved through the account in that month were unusually high, due in part to Plaintiff's August $20 million loan proceeds. The beginning balance in the Trust Account was $5,960,394.98, inflows were $100,948,711.97, and outflows were $93,219,666.21, all on account of 70 deposits and 93 withdrawals, with an ending balance of $13,689,440.74.

121.    On August 14, 2020, the same day that the Trust Account received the $20 million from Plaintiff's August 2020 Loan, which Wright Brothers was supposed to hold in escrow in the Trust Account, $10 million was immediately disbursed in part in two $5 million transfers, one of which, upon information and belief, was used to repay another victim of the Ponzi scheme.

122.    In addition, as discussed above, in 2019 and 2020, there were over 100 instances in which large escrow deposits were made into the Trust Account followed the same day or the next day by large transfers of some or all of such deposits out of the Trust Account.  Specifically as to Plaintiff, on August 8, 2019, Plaintiff wired the proceeds from the August 2019 Loan to the Trust Account in the amount of $15 million, which wire was received in the Trust Account.  The very next day, all of such funds are transferred to another alleged victim of the "Ponzi" scheme.

123.    Bank of America, as a sophisticated national bank that routinely sets up, maintains and monitors escrow and trust accounts, knew or was willfully blind to the fact that the activity in

the Trust Account, was, at a minimum, irregular and suspicious.  Bank of America either knew or was willfully blind to the suspicious transactions in the Trust Account that were indicative of monies being stolen from the Trust Account.  However, Bank of America failed to disclose any such information in connection with any of the numerous Comfort Letters and Balance Verification Letters that it issued and upon which Plaintiff reasonably relied.

124.    According to paragraph 54 of the Indictment, the Fraudsters' fraudulent Ponzi scheme was operating through the Bank of America Trust Account beginning no later than 2016. Thus, Bank of America issued at least nine (9) Comfort Letters and Balance Verification Letters while the fraudulent scheme was underway (namely, the August 2015 Letter, the December 2015 Letter, the July 2016, the January 2017 Letter, the April 2017 Letter, the February 2018 letter, the January 2019 Letter, the March 2019 Letter and the August 2019 Letter).

125.    As set forth above, Plaintiff, through Mr. Saks, relied on each of the August 2015 Letter, the July 2016, the January 2017 Letter, the January 2019 Letter, the March 2019 Letter and the August 2019 Letter, as well as the representations made to Plaintiff's representative by Ms. Parks and Ms. Haralson described above, in connection with the related loan and aircraft finance transactions that Plaintiff engaged in with South Aviation through Wright Brothers as the escrow agent and the Bank of America Trust Account as the escrow account, including the December 2019 Loan and the August 2020 Loan.

126.    Accordingly, either Bank of America knew of, intentionally ignored and/or was willfully blind to the suspicious activity occurring in the Trust Account, and thereby omitted material information about the activity in the Trust Account before, during, and after the provision of the Comfort Letters and the Balance Verification Letters.

127.    Bank of America knew that the Comfort Letters and the Balance Verification Letters contained materially false and misleading information and omissions about Wright Brothers and about the Trust Account.  Bank of America also knew that Wright Brothers was using such Comfort Letters and Balance Verification Letters to induce potential Trust Account Depositors, or at least specifically the Plaintiff, to deposit funds into the Trust Account. Thus, Bank of America, as a sophisticated national bank, knew that Wright Brothers was engaged in conduct calculated to deceive potential Trust Account Depositors, or at least specifically the Plaintiff, out of money or property through the use of interstate wires. Given such knowledge, Bank of America had a duty to investigate the activity in the Trust Account, including in connection with preparing the Balance Verification Letters, and such an investigation would have revealed the existence of the Ponzi scheme described above or, at a minimum, would have revealed the diversion of the Plaintiff's funds, and thus would have prevented the damages suffered by the Plaintiff. Bank of America either conducted such investigation and had actual knowledge of the scheme to defraud the Plaintiff, or was willfully blind to the suspicious transactions in the Trust Account that were indicative of and would have revealed such scheme.

## <u>COUNT I</u>

### **NEGLIGENT MISREPRESENTATION**

128.    Plaintiff incorporate the allegations in paragraphs 1 through 127 above as though fully set forth herein.

129.    Bank of America made several material representations of fact in the Comfort Letters, the Balance Verification Letters and telephonically to Plaintiff that were materially false and misleading, and also omitted material information required to make its disclosures complete, correct and not misleading.

130.    Specifically, Bank of America knew, should have known, or was willfully blind to the fact that the factual information presented in the Comfort Letters and the Balance Verification Letters concerning Wright Brothers and its accounts was materially false, incomplete, and inaccurate, including specifically in the August 2015 Letter, the July 2016, the January 2017 Letter, the January 2019 Letter, the March 2019 Letter and the August 2019 Letter, which Plaintiff reasonably relied upon in making loans to South Aviation and in depositing the proceeds thereof into the Trust Account, including under the Escrow Agreements for the December 2019 Loan and the August 2020 Loan.

131.    Bank of America knew that Wright Brothers was using the Comfort Letters and the Balance Verification Letters in connection with providing assurances to clients, namely Plaintiff, to engage in escrow transactions with Wright Brothers and to deposit millions of dollars into the Trust Account.

132.    Bank of America's false and misleading representations and omissions were material because a reasonable potential Trust Account Depositor would consider those representations and the omitted information important in deciding whether Wright Brothers was a legitimate, solvent, respected, and stable aviation title and escrow company that could be trusted to safeguard large sums of money placed in its Trust Account, including specifically (i) that Wright Brothers was a "well respected aviation title company," (ii) the average balance in Wright Brothers' Trust Account, (iii) the dollar amount of aviation transactions that flowed through Wright Brothers' Trust Account, and (iv) the lack of any suspicious or unusual activity indicative of theft in the Trust Account.

133.    It was foreseeable that Wright Brothers would provide the Comfort Letters and the Balance Verification Letters to third parties, including specifically Plaintiff, in order to solicit

business, as that was the very purpose of the Comfort Letters and the Balance Verification Letters. Ultimately, Bank of America knew that Plaintiff was provided with certain Balance Verification Letters in connection with proposed transactions that involved the deposit of millions of dollars into the Trust Account.

134.    Bank of America provided verbal confirmation to Plaintiff that the March 2019 Letter was authentic and accurate, and thereafter confirmed the authenticity and accuracy of the August 2019 Letter.

135.    Bank of America knew that Plaintiff had reviewed the March 2019 Letter and was relying upon such Balance Verification Letter, as well as Bank of America's verbal confirmation of that letter, in entering into the transactions with Wright Brothers, specifically in connection with the above loans and renewals, including the December 2019 Loan and the August 2020 Loan.

136.    Accordingly, Bank of America intended that third parties, including specifically Plaintiff, would and did, in fact, consider, rely on, and act upon the misrepresentations contained in the Comfort Letters and the Balance Verification Letters.

137.    Plaintiff reasonably and justifiably relied upon Bank of America's misrepresentations and omissions in the Comfort Letters and the Balance Verification Letters, as well as the verbal confirmations of those letters, to its detriment.

138.    Bank of America owed Plaintiff (who was actually known to Bank of America as a party receiving and relying on at least the March 2019 Letter) and other foreseeable recipients of the Comfort Letters and the Balance Verification Letters a duty of full disclosure once it elected to volunteer specific factual information about the balance in the Trust Accounts, and the specific dollar amounts passing through the Trust Account, as well as information about Wright Brothers and its reputation and its banking and other history with Bank of America.

139.     As detailed above, Bank of America provided materially false and misleading facts and information about Wright Brothers and Wright Brothers' account balances and the dollar amounts passing through the Trust Account, and omitted material facts about Wright Brothers and the Trust Account.  Bank of America failed to exercise the reasonable care required of competent bank officers in drafting and issuing the Comfort Letters and the Balance Verification Letters.

140.     Bank of America also omitted material information about suspicious and unusual activity in the Trust Account from each of the Comfort Letters and the Balance Verification Letters.

141.     When deciding whether Wright Brothers was a legitimate aviation escrow business worthy of being entrusted with control over substantial funds, a reasonable Trust Account Depositor would reasonably rely upon Bank of America's representations about Wright Brothers' "excellent" standing with Bank of America and was a "well respected aviation title company," as well as the factual information that Bank of America supplied about Wright Brothers' average account balance, and specific representations about the dollar amount of transactions processed through the Wright Brothers' account held and maintained by Bank of America.  A reasonable Trust Account Depositor would also reasonably rely upon the absence of any representations about any suspicious transactions conducted through Wright Brothers' accounts maintained at Bank of America as a representation that there were no such transactions.

142.     Bank of America is one of the largest and best known banks in the United States, and Plaintiff, to its detriment, reasonably and justifiably relied on Bank of America to provide accurate and truthful information in the Comfort Letters and the Balance Verification Letters, and Plaintiff sustained damages as a result of such reliance.

143.     Plaintiff, to its detriment, reasonably and justifiably relied on Bank of America's materially false and misleading statements about Wright Brothers and its accounts in the Comfort

Letters and the Balance Verification Letters, and as a direct and proximate result sustained actual damages in an amount to be proven at trial, but which is at least $29,000,000.

## COUNT II

## NEGLIGENCE UNDER § 552 OF THE RESTATEMENT (SECOND) OF TORTS

144.    Plaintiff incorporate the allegations in paragraphs 1 through 127 above as though fully set forth herein.

145.    Bank of America, in the course of its business, or in connection with transactions in which it had a pecuniary interest, made several material representations of fact in the Comfort Letters, the Balance Verification Letters and telephonically to Plaintiff that were materially false and misleading, and also omitted material information required to make its disclosures complete, correct and not misleading.

146.    Specifically, Bank of America knew, should have known, or was willfully blind to the fact that the factual information presented in the Comfort Letters and the Balance Verification Letters concerning Wright Brothers and its accounts was materially false, incomplete, and inaccurate, including specifically in the August 2015 Letter, the July 2016, the January 2017 Letter, the January 2019 Letter, the March 2019 Letter and the August 2019 Letter, which Plaintiff reasonably relied upon in making loans to South Aviation and in depositing the proceeds thereof into the Trust Account, including under the Escrow Agreements for the December 2019 Loan and the August 2020 Loan.

147.    Bank of America knew that Wright Brothers was using the Comfort Letters and the Balance Verification Letters in connection with providing assurances to clients, namely Plaintiff, to engage in escrow transactions with Wright Brothers and to deposit millions of dollars into the Trust Account.

148.    Bank of America's false and misleading representations and omissions were material because a reasonable potential Trust Account Depositor would consider those representations and the omitted information important in deciding whether Wright Brothers was a legitimate, solvent, respected, and stable aviation title and escrow company that could be trusted to safeguard large sums of money placed in its Trust Account, including specifically (i) that Wright Brothers was a "well respected aviation title company," (ii) the average balance in Wright Brothers' Trust Account, (iii) the dollar amount of aviation transactions that flowed through Wright Brothers' Trust Account, and (iv) the lack of any suspicious or unusual activity indicative of theft in the Trust Account.

149.    It was foreseeable that Wright Brothers would provide the Comfort Letters and the Balance Verification Letters to third parties, including specifically Plaintiff, in order to solicit business, as that was the very purpose of the Comfort Letters and the Balance Verification Letters. Ultimately, Bank of America knew that Plaintiff was provided with certain Balance Verification Letters in connection with proposed transactions that involved the deposit of millions of dollars into the Trust Account.

150.    Bank of America provided verbal confirmation to Plaintiff that the March 2019 Letter was authentic and accurate, and thereafter confirmed the authenticity and accuracy of the August 2019 Letter.

151.    Bank of America knew that Plaintiff had reviewed the March 2019 Letter and was relying upon such Balance Verification Letter, as well as Bank of America's verbal confirmation of that letter, in entering into the transactions with Wright Brothers, specifically in connection with the above loans and renewals, including the December 2019 Loan and the August 2020 Loan.

152.    Accordingly, Bank of America intended that third parties, including specifically Plaintiff, would and did, in fact, consider and rely on the misrepresentations contained in the Comfort Letters and the Balance Verification Letters for guidance in connection with business transactions with Wright Brothers.

153.    Plaintiff reasonably and justifiably relied upon Bank of America's misrepresentations and omissions in the Comfort Letters and the Balance Verification Letters, as well as the verbal confirmations of those letters, to its detriment.

154.    Bank of America owed Plaintiff (who was actually known to Bank of America as a party receiving and relying on at least the March 2019 Letter) and other foreseeable recipients of the Comfort Letters and the Balance Verification Letters a duty of full disclosure once it elected to volunteer specific factual information about the balance in the Trust Accounts, and the specific dollar amounts passing through the Trust Account, as well as information about Wright Brothers and its reputation and its banking and other history with Bank of America.

155.    As detailed above, Bank of America provided materially false and misleading facts and information about Wright Brothers and Wright Brothers' account balances and the dollar amounts passing through the Trust Account, and omitted material facts about Wright Brothers and the Trust Account.  Bank of America failed to exercise the reasonable care required of competent bank officers in drafting and issuing the Comfort Letters and the Balance Verification Letters.

156.    Bank of America also omitted material information about suspicious and unusual activity in the Trust Account from each of the Comfort Letters and the Balance Verification Letters.

157.    When deciding whether Wright Brothers was a legitimate aviation escrow business worthy of being entrusted with control over substantial funds, a reasonable Trust Account Depositor would reasonably rely upon Bank of America's representations about Wright Brothers'

"excellent" standing with Bank of America and was a "well respected aviation title company," as well as the factual information that Bank of America supplied about Wright Brothers' average account balance, and specific representations about the dollar amount of transactions processed through the Wright Brothers' account held and maintained by Bank of America.  A reasonable Trust Account Depositor would also reasonably rely upon the absence of any representations about any suspicious transactions conducted through Wright Brothers' accounts maintained at Bank of America as a representation that there were no such transactions.

158.    Bank of America is one of the largest and best known banks in the United States, and Plaintiff, to its detriment, reasonably and justifiably relied on Bank of America to provide accurate and truthful information in the Comfort Letters and the Balance Verification Letters, and Plaintiff sustained damages as a result of such reliance.

159.    Plaintiff, to its detriment, reasonably and justifiably relied on Bank of America's materially false and misleading statements about Wright Brothers and its accounts in the Comfort Letters and the Balance Verification Letters, and as a direct and proximate result sustained actual damages in an amount to be proven at trial, but which is at least $29,000,000.

## COUNT III

### FRAUDULENT MISREPRESENTATION

160.    Plaintiff incorporates the allegations in paragraphs 1 through 127 above as though fully set forth herein.

161.    The representations made by Bank of America in the Comfort Letters and the Balance Verification Letters provided by Haralson were materially false and misleading, and omitted material information as outlined above.

162.    Bank of America knew or was willfully blind to the fact that the representations in the Comfort Letters and the Balance Verification Letters provided by Haralson were materially false and misleading, and omitted material information.

163.    Bank of America knew that Wright Brothers intended to provide the materially false and misleading Comfort Letters and Balance Verification Letters to potential Trust Account Depositors, specifically Plaintiff, to induce them to enter into escrow transactions with Wright Brothers and deposit millions of dollars into the Trust Account.

164.    Bank of America knew, at a minimum, that Plaintiff relied on the March 2019 Letter in making new loans and/or renewing existing loans to South Aviation through deposits in the Wright Brothers' Trust Account.

165.    Plaintiff reasonably relied upon the materially false information in the Comfort Letters and the Balance Verification Letters, as well as the verbal confirmations of those letters from Haralson, and as a direct and proximate result, Plaintiff sustained actual damages in an amount to be proven at trial, but which is at least $29,000,000.

## COUNT IV

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

166.    Plaintiff incorporates the allegations in paragraphs 1 through 127 above as though fully set forth herein.

167.    A fiduciary relationship existed between Wright Brothers and Plaintiff.

168.    The Trust Account was opened, labeled and described as a trust account by Bank of America.  Bank of America knew that Wright Brothers owed a fiduciary duty to the Plaintiff, as well as other Trust Account Depositors.

169.    Wright Brothers breached its fiduciary duties to Plaintiff by diverting and stealing Plaintiff's fully refundable escrow deposits from the Trust Account, or allowing those funds to be diverted and stolen by the Fraudsters, including in direct violation of the terms of the Escrow Agreements.

170.    From its review of the account statements and account activity that it conducted in connection with preparing the Comfort Letters and the Balance Verification Letters, Bank of America knew or was willfully blind to the fact that the information in the Comfort Letters and Balance Verification Letters was materially false and misleading, and omitted material information that was required to be included to make them truthful and complete.

171.    Bank of America also detected and was aware of the suspicious activity in the Trust Account over, at a minimum, a four-year period, through its policies and procedures, including its anti-money laundering compliance program and automated account monitoring systems, further evidencing Bank of America's knowledge of or willful blindness to the fact that the information in the Comfort Letters and Balance Verification Letters was materially false and misleading, and omitted material information that was required to be included to make them truthful and complete.

172.    Thus, Bank of America had actual knowledge of Wright Brothers' breach of its fiduciary duties to Plaintiff.

173.    In the alternative, Bank of America was willfully blind as to Wright Brothers' breach of fiduciary duties to Plaintiff by intentionally failing to make reasonable inquiries when faced with the suspicion or awareness of the high likelihood of wrongdoing in connection with the Trust Account, and notwithstanding Bank of America took the affirmative step of drafting the Comfort Letters and the Balance Verification Letters and then providing those letters to Wright

Brothers, knowing that Wright Brothers would in turn supply such letters to third parties to be used to persuade Trust Account Depositors, like Plaintiff, to deposit funds into the Trust Account.

174.    Bank of America knowingly and substantially assisted, enabled, and facilitated Wright Brothers' breach of fiduciary duties owed to Plaintiff by providing, at least, nine separate letters over a four-year span, specifically targeted to persuade Trust Account Depositors, like Plaintiff, to deposit their funds in the Trust Account.

175.    Bank of America should have suspended or terminated the Trust Account based on the activity occurring in the Trust Account, or, at a minimum, Bank of America should have refrained from providing materially false and misleading Comfort Letters and Balance Verification Letters with respect to Wright Brothers and the Trust Account and should have included all material information that was omitted.  Had Bank of America done any of those things, then Plaintiff would not have deposited its funds in the Bank of America Trust Account, and the money would not have been stolen.

176.    Bank of America knowingly and substantially assisted, enabled, and facilitated Wright Brothers' breach of fiduciary duties owed to Plaintiff by, among other things, (i) failing to adhere to international, federal, local, and internal regulatory banking procedures and policies, (ii) by failing to prevent the misappropriation and theft of Plaintiff's funds deposited into the Trust Account, and (iii) by providing the Comfort Letters and the Balance Verification Letters (that it knew or was willfully blind to the fact were materially false and omitted material information).

177.    In addition, Bank of America substantially assisted, enabled, and facilitated Wright Brothers' breach of fiduciary duties owed to Plaintiff through its willful blindness to the pattern of suspicious activity in connection with the Trust Account.

48

178.     Bank of America played a critical role in allowing the Fraudsters to perpetrate and perpetuate a wide-spread scheme to defraud Plaintiff and others while profiting from its own misconduct.

179.     Bank of America's conduct described herein caused Plaintiff actual damages in an amount to be proven at trial, but which are at least $29,000,000.

<u>COUNT V</u>

**AIDING AND ABETTING FRAUD**

180.     Plaintiff incorporates the allegations in paragraphs 1 through 127 above as though fully set forth herein.

181.     The Trust Account was opened, labeled and described as a trust account by Bank of America.  Based upon the activity in the Trust Account as well as the false statements in the Comfort Letters and the Balance Verification Letters, Bank of America knew that Wright Brothers was defrauding the Plaintiff, as well as other Trust Account Depositors.

182.     Wright Brothers defrauded Plaintiff by inducing them to deposit funds to the Trust Account based on the materially false statements in the Comfort Letters and the Balance Verification Letters, and then diverting and stealing Plaintiff's fully refundable escrow deposits from the Trust Account, or allowing those funds to be diverted and stolen by the Fraudsters, in direct violation of the terms of the Escrow Agreements.

183.     From its review of the account statements and account activity that it conducted in connection with preparing the Comfort Letters and the Balance Verification Letters, Bank of America knew or was willfully blind to the fact that the information in the Comfort Letters and Balance Verification Letters was materially false and misleading, and omitted material information that was required to be included to make them truthful and complete.

184.     Bank of America also detected and was aware of the suspicious activity in the Trust Account over, at a minimum, a four-year period, through its policies and procedures, including its anti-money laundering compliance program and its automated account monitoring systems, further evidencing Bank of America's knowledge of or willful blindness to the fact that the information in the Comfort Letters and Balance Verification Letters was materially false and misleading and omitted material information that was required to be included to make them truthful and complete.

185.     Thus, Bank of America had actual knowledge that Wright Brothers was defrauding the Plaintiff.

186.     In the alternative, Bank of America was willfully blind as to Wright Brothers' fraud by intentionally failing to make reasonable inquiries when faced with the suspicion or awareness of the high likelihood of wrongdoing in connection with the Trust Account, and notwithstanding Bank of America took the affirmative step of drafting the Comfort Letters and the Balance Verification Letters and then providing those letter to Wright Brothers, knowing that Wright Brothers would in turn supply such letters to third parties to be used to persuade Trust Account Depositors, like Plaintiff, to deposit funds into the Trust Account.

187.     Bank of America knowingly and substantially assisted, enabled, and facilitated Wright Brothers' fraud by providing, at least, nine separate letters over a four-year span, specifically targeted to persuade Trust Account Depositors, like Plaintiff, to deposit their funds in the Trust Account.

188.     Bank of America should have suspended or terminated the Trust Account based on the activity occurring in the Trust Account, or, at a minimum, Bank of America should have refrained from providing materially false and misleading Comfort Letters and Balance Verification Letters with respect to Wright Brothers and the Trust Account and should have included all material

information that was omitted. Had Bank of America done any of those things, then Plaintiff would not have deposited its funds in the Bank of America Trust Account, and the money would not have been stolen.

189. Bank of America knowingly and substantially assisted, enabled, and facilitated Wright Brothers' fraud by among other things (i) failing to adhere to international, federal, local, and internal regulatory banking procedures and policies, (ii) by failing to prevent the misappropriation and theft of Plaintiff's funds deposited into the Trust Account, and (iii) by providing the Comfort Letters and the Balance Verification Letters (that it knew or was willfully blind to the fact were materially false and omitted material information).

190. In addition, Bank of America substantially assisted, enabled, and facilitated Wright Brothers' fraud against the Plaintiff through its willful blindness to the pattern of suspicious activity in connection with the Trust Account.

191. Bank of America played a critical role in allowing the Fraudsters to perpetrate and perpetuate a wide-spread scheme to defraud Plaintiff and others while profiting from its own misconduct.

192. Bank of America's conduct described herein caused Plaintiff actual damages in an amount to be proven at trial, but which are at least $29,000,000.

## COUNT VI

### AIDING AND ABETTING CONVERSION

193. Plaintiff incorporates the allegations in paragraphs 1 through 127 above as though fully set forth herein.

194.    The Trust Account was opened, labeled and described as a trust account by Bank of America.  Bank of America knew that Wright Brothers' Trust Account held monies belonging to the Plaintiff, as well as other Trust Account Depositors.

195.    Wright Brothers converted Plaintiff's monies by diverting and stealing certain of Plaintiff's fully refundable escrow deposits from the Trust Account.

196.    From its review of the account statements and account activity that it conducted in connection with preparing the Comfort Letters and the Balance Verification Letters, Bank of America knew that Wright Brothers was converting monies belonging to others, including the Plaintiff.

197.    Bank of America also detected and was aware of the suspicious activity in the Trust Account over, at a minimum, a four-year period, through its policies and procedures, including its anti-money laundering compliance program and its automated account monitoring systems, further evidencing Bank of America's knowledge that Wright Brothers was converting funds belonging to Trust Depositors.

198.    Thus, Bank of America had actual knowledge of Wright Brothers' conversion.

199.    In the alternative, Bank of America was willfully blind as to Wright Brothers' conversion by intentionally failing to make reasonable inquiries when faced with the suspicion or awareness of the high likelihood of wrongdoing in connection with the Trust Account, and notwithstanding Bank of America took the affirmative step of drafting the Comfort Letters and the Balance Verification Letters and then providing those letters to Wright Brothers, knowing that Wright Brothers would in turn supply such letters to third parties to be used to persuade Trust Account Depositors, like Plaintiff, to deposit funds into the Trust Account.

200.    Bank of America knowingly and substantially assisted, enabled, and facilitated Wright Brothers' conversion by providing, at least, nine separate letters over a four-year span, specifically targeted to persuade Trust Account Depositors, like Plaintiff, to deposit their funds in the Trust Account.

201.    Bank of America should have suspended or terminated the Trust Account based on the activity occurring in the account, or, at a minimum, Bank of America should have refrained from providing materially false and misleading Comfort Letters and Balance Verification Letters with respect to Wright Brothers and the Trust Account and should have included all material information that was omitted.  Had Bank of America done any of those things, then Plaintiff would not have deposited its funds in the Bank of America Trust Account, and the money would not have been stolen.

202.    Bank of America knowingly and substantially assisted, enabled, and facilitated Wright Brothers' conversion of Plaintiff's monies by, among other things, (i) failing to adhere to international, federal, local, and internal regulatory banking procedures and policies, (ii) by failing to prevent the misappropriation and theft of Plaintiff's funds deposited into the Trust Account, and (iii) by providing the Comfort Letters and the Balance Verification Letters (that it knew or was willfully blind to the fact were materially false and omitted material information).

203.    In addition, Bank of America substantially assisted, enabled, and facilitated Wright Brothers' conversion through its willful blindness to the pattern of suspicious activity in connection with the Trust Account.

204.    Bank of America played a critical role in allowing the Fraudsters to perpetrate and perpetuate a wide-spread scheme to defraud Plaintiff and convert its monies while profiting from its own misconduct.

205.    Bank of America's conduct described herein caused Plaintiff actual damages in an amount to be proven at trial, but which are at least $29,000,000.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for monetary damages in excess of the amount required for diversity jurisdiction under 28 U.S.C. § 1332, and the entry of judgment on its claims against Bank of America as follows:

A.    A judgment awarding damages of at least $29,000,000.

B.    A judgment awarding Plaintiff their attorneys' fees as permitted by law.

C.    A judgment awarding Plaintiff their pre-judgment interest, costs and disbursements as permitted by law.

D.    A judgment awarding Plaintiff punitive damages.

E.    A judgment awarding Plaintiff such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: July 1, 2022

GENOVESE JOBLOVE & BATTISTA, P.A.
*Counsel for Plaintiff*
100 Southeast Second Street, Suite 4400
Miami, Florida 33131
Tel: (305) 349-2300
Fax: (305) 349-2310

By: /s/ Paul J. Battista, Esq.
Paul J. Battista, Esq., FBN 884162
pbattista@gjb-law.com
John H. Genovese, Esq., FBN 280852
jgenovese@gjb-law.com
Gregory M. Garno, Esq., FBN 087505
ggarno@gjb-law.com
Michael A. Friedman, Esq., FBN 071828
mfriedman@gjb-law.com