UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-80980-BER

METROCITY HOLDINGS, LLC,

               Plaintiff,

vs.

BANK OF AMERICA, N.A.,

               Defendant.

_____/

## **ORDER DENYING DEFENDANT'S MOTION TO DISMISS (ECF No. 18)**

Plaintiff Metrocity Holdings, LLC (Metrocity) brings this lawsuit as the victim of a Ponzi scheme, having loaned millions of dollars to purportedly finance the purchase of commercial aircraft. The loaned funds were deposited into a Bank of America (BOA) account owned by Wright Brothers Aircraft Title, Inc. (Wright Bros.), which then misappropriated the funds to further the scheme. Metrocity was ultimately defrauded out of $29 million. Metrocity alleges that BOA facilitated the fraud by vouching for Wright Bros. and inducing Metrocity to deposit money based on material omissions and misrepresentations. ECF No. 1.

Metrocity filed a six-count complaint alleging claims for negligent misrepresentation (Count I), negligence under §552 of the Restatement (Second) of Torts (Count II), fraudulent misrepresentation (Count III), aiding and abetting breach of fiduciary duty (Count IV), aiding and abetting fraud (Count V), and aiding and abetting conversion (Count VI). ECF No. 1. BOA moves to dismiss the Complaint

for inadequate pleading under Rules 12(b)(6) and 9(b). I heard oral argument of the motion on August 16, 2023.

## LEGAL STANDARDS

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy Rule 8, a claim must provide the defendant fair notice of plaintiff's claim and the grounds upon which it rests. *See Swierkiewicz v. Sorema N.A.,* 534 U. S. 506, 512 (2002). While a claim "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal,* 556 U. S. 662, 678 (2009) (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"). Nor can a claim rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U. S. at 678 (*quoting Twombly*, 550 U. S. at 557 (alteration in original)).

On a motion to dismiss under Rule 12(b)(6), the Court must view the well-pled factual allegations in a claim in the light most favorable to the non-moving party. *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Viewed in that manner, the factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the claim are true (even if doubtful in fact). *Twombly*, 550 U. S. at 555 (citations omitted). The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain

2

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 570. In addition, "courts may infer from factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct that plaintiff would ask the court to infer." *Am. Dental Assoc. v. Cigna Corp.*, 605 F. 3d 1283, 1290 (11th Cir. 2010) (citing *Iqbal,* 556 U. S. at 682). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal,* 556 U. S. at 678 (quoting *Twombly,* 550 U. S. at 557). When evaluating a motion to dismiss under Rule 12(b)(6):

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal,* 556 U. S. at 679. Factually unsupported allegations based "on information and belief" are not entitled to the assumption of truth. *See Scott v. Experian Info. Sols., Inc.*, 2018 WL 3360754, at *6 (S. D. Fla. June 29, 2018) (J. Altonaga) ("Conclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard.").

Where a pleading alleges a cause of action sounding in fraud, the allegations must satisfy Federal Rule of Civil Procedure 9(b), which says "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Rule 9(b) does not change the elements of the underlying cause of action; it merely requires heightened fact pleading. "[A] plaintiff is required to plead the 'who, what, when, where, and how' pertaining to the underlying fraud." *Cardenas v. Toyota Motor Corp.*, 418 F. Supp. 3d 1090, 1098 (S.D. Fla. 2019) (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006)). The purpose of the particularity pleading requirement "is to alert defendants to their precise misconduct and protect them against baseless charges of fraudulent behavior." *Cardenas,* 418 F. Supp. 3d at 1098 (citing *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988)).

## FACTS ALLEGED IN THE COMPLAINT

Since at least 2002, Wright Bros. maintained an account at BOA (the "Trust Account") which it used to hold escrow funds for the finance and purchase of aircraft. ¶4.[1]   BOA earned fees and other substantial consideration from maintaining the Trust Account over the course of many years, and thus, had a pecuniary interest in it. ¶¶29, 145.

Metrocity's role was to provide the purported aircraft purchaser with a refundable deposit, which was supposed to be used as security for a loan to purchase an aircraft.  ¶24.  The purported purchaser would designate the Trust Account, controlled by Wright Bros., to hold the funds in escrow.  *Id.*  Metrocity charged interest on the loan and the funds were only to be disbursed in accordance with strict escrow requirements, which provided that the money would be fully refunded from the Trust Account unless the buyer successfully completed an inspection of the

---

[1] Citations are to the numbered paragraphs in the Complaint at ECF No. 1.

aircraft by a date certain.  ¶¶1, 24.  In reality, no aircraft inspections occurred and the money Metrocity deposited into the Trust Account was not refunded; instead, the purported purchaser and Wright Bros. were engaged in a Ponzi scheme and stole the funds for their own purposes.  ¶24.

*The Comfort Letters and Balance Verification Letters*

Since at least 2015, BOA issued numerous letters on behalf of Wright Bros. to assure prospective Trust Account depositors, including Metrocity, that Wright Bros. was a stable, solvent, and well-respected entity with a strong banking history and the financial ability to meet its obligations, and that Wright Bros. could be trusted to serve as a disinterested escrow agent. ¶6. Certain of the letters (the "Comfort Letters") described (i) the longstanding and "strong" banking relationship that BOA enjoyed with Wright Bros. for approximately 14–17 years, (ii) the "excellent" standing of Wright Bros.' accounts, and (iii) Wright Bros. as a "well respected aviation title company."  ¶6.

BOA also issued "Balance Verification Letters" that provided the average balance in the Trust Account over a specific period of time and the dollar amounts of relevant transactions. ¶7. BOA knew that Metrocity relied on the Comfort Letters and the Balance Verification Letters ("the Letters") in entering into escrow transactions with Wright Bros. ¶8. BOA had a duty to Metrocity to provide truthful information in the Letters when BOA decided to prepare and issue them. ¶11.

In response to Metrocity's requests to Wright Bros., BOA furnished multiple Comfort Letters and Balance Verification Letters. ¶¶54, 57. These kinds of letters are

routinely issued by banks to their clients to provide assurance to third-parties who are considering doing business with the bank's customer.  ¶55. Metrocity's sole member, Nathan Saks, received the Letters and relied upon them in deciding to enter into loans and escrow agreements with Wright Bros. ¶¶15, 54, 56, 60. Knowing the average collected balances in, and volume of funds passing through, the Trust Account enabled Metrocity to confirm that the Trust Account was secure and contained the escrow funds previously deposited by Metrocity, which in turn further signified a legitimate aircraft title and escrow operation. ¶58.

BOA knew that Wright Bros. was providing the Letters to Metrocity and that Metrocity would rely on them to proceed with transactions. ¶61. BOA maintains policies and procedures, including its anti-money laundering compliance program, that govern the drafting and issuing of the Letters to ensure that they are complete, accurate and truthful. ¶62. BOA's own policies and procedures, in addition to applicable banking regulations, would have required that BOA review and confirm the balances in the Trust Account before preparing Balance Verification Letters. ¶109.

1. The 2015 Comfort Letters

In August 2015 and December 2015, Metrocity received Comfort Letters that BOA issued on behalf of Wright Bros. BOA furnished these "letter[s] of reference" to describe a 14-year "strong banking relationship" with Wright Bros., a "respected aviation title company," whose accounts were in "excellent" or "good" standing. ¶¶63,

67, Exhibit A. Each letter stated that over $300 million in aviation transactions had passed through Wright Bros.' accounts in the previous six months. *Id.*

    2. <u>The Mark Fish Balance Verification Letters</u>

In July 2016, Metrocity received a Balance Verification Letter prepared by BOA Senior Vice President Mark Fish stating that Wright Bros. "maintained an aggregate average collected deposit balance of $11,818,006.50 over the past twelve months." ¶¶68, 71, Exhibit B.[2] In January 2017, Metrocity received a similar letter prepared by Mr. Fish stating that the "aggregate average collected deposit balance" maintained by Wright Bros. over the previous twelve months was $11,648,172.00. ¶¶74, 76, Exhibit C.[3] In April 2017, Mr. Fish sent another letter stating that "the total amount of all deposits made into the [Wright Bros.'] escrow account in calendar year 2016 was $405,612,916.62." ¶79, Exhibit D.

    3. <u>The Elizabeth Haralson Balance Verification Letters</u>

In February 2018, another BOA employee, Elizabeth Haralson,[4] issued a "letter of reference regarding the relationship between [Wright Bros. and BOA]."

---

[2] According to the Complaint, this amount "appears to have been calculated accurately based on the 'average ledger balance' for the months identified in the letter." ¶70 (citing monthly account statements for Wright Bros. Trust Account at BOA, which are not attached to the Complaint).

[3] Again, the Complaint states that this amount "appears to have been calculated accurately based on the 'average ledger balance' for the months identified in the letter." ¶75.

[4] The letters prepared by Ms. Haralson indicate that between February 2018 and March 2019, she was promoted from a Relationship Manager to a Senior Vice President at BOA. Exhibits E, F, G.

Exhibit E. The letter describes a "strong banking relationship" over 17 years with Wright Bros., which was a "well respected aviation title company," whose "accounts are in excellent standing." ¶¶81, 82, Exhibit E.  The letter stated that Wright Bros.' "average volume" over the previous six months was $183 million. *Id.* According to the Complaint, the bank statements (which are not attached) reveal that Wright Bros. "had a *total*, not average, volume of $183 million in credits and deposits during that time period. The average amount in the account during the time period at issue was in fact around $31 million — *one-sixth* of the $183 million that [BOA] represented it to be in the February 2018 Letter." ¶83 (emphasis in original).

In January 2019, Metrocity received a "letter of reference" prepared by Ms. Haralson which reiterated her description of Wright Bros. and this time stated that over $257 million in "aviation transactions have passed through their account" in the previous six months. ¶¶85, 88 Exhibit F.

In March 2019, Ms. Haralson prepared another letter, which Metrocity "specifically requested" from Wright Bros. ¶¶90, 95. In this letter, Ms. Haralson stated that Wright Bros. "maintained an average collected balance of $25,700,936.26 over the past six months."  ¶90, Exhibit G. However, the "average collected balance" for the time period referenced in the March 2019 Letter, when calculated with the methodology Mr. Fish used in the January and April 2017 Letters, is only $11,220,149.21 ("*less than half*" of the $25,700,936.26 represented by Ms. Haralson in the March 2019 Letter). ¶91 (emphasis in original).

In the March 2019 Letter, Ms. Haralson "appears to adopt a new methodology to calculate the 'average collected balance' that is not tied to the average ledger balances[,] . . . contradicts [BOA's] own internal definition of the term 'collected balance' . . .[and] masks the large withdrawals from the account."  ¶¶92, 93.

On March 5, 2019, a representative of Metrocity spoke on the phone with Ms. Haralson's assistant, Angela Parks, and explained that he wanted to confirm the accuracy of the March 2019 letter. ¶96. During that phone call, Metrocity's representative advised Ms. Parks that the letter had been provided to Metrocity in connection with a proposed transaction with Wright Bros.  *Id.*  Ms. Parks placed the call on hold, and when she returned, she stated that she had spoken to Ms. Haralson, who confirmed that "*the March 2019 Letter was authentic and its contents were accurate.*"  *Id.* (emphasis in original). Ms. Parks also confirmed that the March 2019 letter had been drafted by or at the direction of Ms. Haralson, who had authorized that the March 2019 Letter be provided to Wright Bros. for their prospective Trust Account depositors like Metrocity. *Id.* As a result of this phone call, BOA knew that Metrocity was relying on the March 2019 Letter in deciding to allow existing funds to remain in the Trust Account and to deposit additional funds into the Trust Account. *Id.*

In considering whether to renew two existing loans and make new loans to Wright Bros., Metrocity wanted to ensure that the escrow funds on deposit in the Trust Account from those two existing loans remained in the Trust Account, so Metrocity required verification from BOA that the Trust Account had at least $24

million on deposit therein for the prior six months. ¶97. The March 2019 Letter, together with the telephone verification from BOA, confirmed and verified to Metrocity that more than $24 million had been on deposit in the Trust Account for the past six months and thus, the prior loan proceeds were safely held in escrow as had been agreed. ¶98. This information induced Metrocity to continue funding money into the BOA Trust Account. *Id.* If the March 2019 Letter had used the proper methodology, it would have revealed that the Trust Account balance had fallen below $24 million. *Id.*

In August 2019, Ms. Haralson prepared another Balance Verification Letter, stating that Wright Bros. "has been a [BOA] customer since 10/2001 and has maintained an average collected balance of $33,938,782.00 over the past six months." ¶100, Exhibit H. The letter used "the same misleading methodology" Ms. Haralson used in the March 2019 Letter. ¶101. Once again, if Mr. Fish's 2017 methodology was used, the letter would have indicated that Wright Bros. actually had an average collected balance of only $5,664.940 (a difference of "*more than $28 million*"). ¶101 (emphasis in original).  BOA's August 2019 Letter again verified that more than $24 million had been on deposit in the Trust Account, thus confirming that Metrocity's prior loan proceeds were still being held in escrow and inducing Metrocity to continue funding money into the account. ¶105.

On or about January 19, 2021, a Metrocity representative spoke to Ms. Haralson to confirm the accuracy and authenticity of the March and August 2019 Letters. ¶107. The Metrocity representative forwarded the letters to Ms. Haralson,

who represented that both letters were valid, authentic and accurate balance verification letters drafted by her or at her direction, and that she provided the letters to Wright Bros. so that it could give them to prospective and actual Trust Account Depositors, such as Metrocity. *Id.*

## DISCUSSION

*Negligent and Fraudulent Misrepresentation (Counts I and III)*

A fraudulent misrepresentation claim under Florida law has four elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *In re Harris*, 3 F.4th 1339, 1349 (11th Cir. 2021) (quoting *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010)). As the Eleventh Circuit has observed, "The Florida Supreme Court has held that the scienter element of fraudulent misrepresentation can be established in a number of ways, and not all of them involve knowledge of falsity: 'The knowledge, by the maker of the representation, of its falsity, ... can be established by either one of the three following phases of proof: (1) [t]hat the representation was made with actual knowledge of its falsity; (2) without knowledge either of its truth or falsity; [or] (3) under circumstances in which the person making it ought to have known, if he did not know, of its falsity.'" *Harris*, 3 F.4th at 1349 (quoting *Joiner v. McCullers*, 158 Fla. 562 (1947)).

"Under Florida law, a negligent misrepresentation claim does not require the defendant's knowledge that the misrepresentation was false. A plaintiff can prevail

on a lesser showing—that the defendant made the misrepresentation "without knowledge of its truth or falsity" or that the defendant "should have known the representation was false." *Harris*, 3 F.4th at 1350 (quoting *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1259 (11th Cir. 2014)). Still, a negligent misrepresentation claim requires heightened specificity under Rule 9(b). *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 951 (11th Cir. 2014).

In its motion to dismiss, BOA contends (1) that the Complaint does not comply with Rule 9(b) because it does not adequately allege what benefit BOA sought to gain from Metrocity's reliance on the misrepresentations and (2) does not plausibly allege that BOA intended to induce Metrocity to deposit money in the Wright Bros. account. ECF No. 18 at 25. BOA also contends, in a footnote, that the Complaint does not plausibly allege that the letters contained misrepresentations of which BOA knew or should have been aware. ECF No. 18 at n.8.

I reject BOA's Rule 9(b) argument. The issue presented by BOA's motion is whether the Complaint states a *claim* upon which relief can be granted. A claim is defined by its elements. So long as all the elements of Counts I and III are plausibly alleged with the specificity required by Rule 9(b), the motion must be denied. BOA agrees that the elements of fraudulent and negligent misrepresentation do not include the defendant obtaining a benefit. BOA also agrees that Rule 9(b) does not add a new element to these causes of action. Combining these concessions, BOA agrees that Metrocity can prevail on Counts I and III even if it does not prove that BOA obtained a benefit. Nevertheless, BOA argues that Counts I and III must be

dismissed for failure to state a claim because they do not plead this non-existent element. Simple logic refutes this argument. Put differently, even if the Complaint were amended to explicitly say that BOA did not benefit from the misrepresentations, it would still plausibly allege every element of negligent and fraudulent misrepresentation and therefore would not be subject to dismissal under Rule 12(b)(6).

Putting aside simple logic, the cases BOA cites are not applicable here. BOA relies on Eleventh Circuit opinions quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1380-81 (11th Cir. 1997). *See, e.g., Hosch v. Wachovia Bank, N.A.*, 815 F. App'x 352, 354 (11th Cir. 2020) (citing *Brooks*). *Brooks* involved a multi-count class action complaint based on alleged violations of the Medicare Secondary Payor statute and that included a civil RICO claim comprising predicate acts of federal mail and wire fraud. The district court granted summary judgment on all counts because the Medicare Secondary Payor statute did not apply. In *dictum*, it said the complaint failed to satisfy Rule 9(b), which required the plaintiff to allege: "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks*, 116 F.3d at 1380-81. The Eleventh Circuit affirmed the summary judgment order but explicitly did not adopt the Rule 9(b) holding. *Id*. at 1365.

As support for this standard, *Brooks* cited *Fitch v. Radnor Industries, Ltd.,* No. 90–2084, 1990 WL 150110, at *2 (E.D. Pa. Sept. 27, 1990), a district court decision from the Eastern District of Pennsylvania that involved claims of securities fraud under Section 17(a) of the Securities Act of 1933. *Fitch,* in turn, cited to *O'Brien v. Nat'l Prop. Analysts Partners,* 719 F. Supp. 222, 225 (S.D.N.Y. 1989), which also involved allegations of securities fraud.

The federal mail and wire fraud statutes require, as an element, that the perpetrator scheme to obtain money or property. *McNally v. United States,* 483 U.S. 350 (1987). Virtually identical language exists in the federal securities laws. *Compare* 18 U.S.C. § 1341 *with* 15 U.S.C. §77q(a). Therefore, the Eleventh Circuit opinions are best read as saying that, when the underlying statute requires proof that the fraud perpetrator obtained property, Rule 9(b) requires the plaintiff to plead that fact with heightened specificity. Here, neither Count I nor Count III requires, as an element, proof that BOA obtained a benefit. So, the lack of any allegations of benefit does not run afoul of Rule 9(b).

Regardless, I find that the Complaint adequately pleads facts showing how BOA benefitted. For example, the Complaint alleges that BOA "earned fees and other substantial consideration from maintaining the . . . Trust Account over the course of many years," during which time "billions of dollars passed through the Trust Account," that BOA "had a pecuniary interest" in the transactions described in the Complaint, and that BOA "profit[ted] from its own misconduct." ¶¶29, 145, 178, 191. *See Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1096 (11th Cir. 2017)

(Court found bank benefitted from fees generated by escrow account with "very substantial deposits" that was used to perpetuate a fraud). Moreover, a plausible inference can be drawn from the allegations in the Complaint that, because BOA had a "longstanding [and] profitable relationship" with Wright Bros., BOA opted to comply with its customer's request to furnish the allegedly false letters rather than refuse to issue the letters or insist upon issuing accurate and truthful letters, because to do so may have jeopardized a lucrative relationship. ¶¶4, 85, 123, 173, 175, 188 Exhibit G.  The Complaint plausibly pleads that the continuation of the scheme benefitted BOA.

Finally, BOA's motion argues that the Complaint must allege that BOA's relationship with Wright Bros. "was made more lucrative by issuing the letters" (ECF No. 18 at 26). This statement is incorrect. As noted above, even accepting BOA's interpretation of Rule 9(b), Metrocity is not required to plead that BOA realized any monetary profit as a direct result of the scheme. It is sufficient to plead "what [BOA] gained by the alleged fraud." The Complaint plausibly alleges that BOA continued a profitable relationship with Wright Bros.

With regard to BOA's second argument, I find that the Complaint adequately pleads that BOA intended to induce Metrocity to deposit money in the Wright Bros.' account. In its motion, BOA attempts to narrow the scope of this element, claiming that the pleadings do not establish that BOA "sought to induce reliance on *the letters*." ECF No. 18 at 26 (emphasis added). Notably, the third element of fraudulent misrepresentation is "an intention that *the representation* induce another to act on

it." *Butler*, 44 So. 3d at 105 (emphasis added). Here, the overall representation was that Wright Bros. was a legitimate, financially-solvent company. That representation encompassed more than just the letters BOA issued; it included the two phone calls between Metrocity and BOA when BOA learned that Metrocity was relying on the letters and confirmed the accuracy of them. Viewing these phone calls in the light most favorable to Metrocity, they plausibly allege that BOA intended for Metrocity to rely on BOA's assurances that Wright Bros. was legitimate and trustworthy.

But, even without the phone calls, the letters themselves are adequate to satisfy this element. BOA's claim that there is no evidence that it "intended unnamed third parties to rely on those letters" (ECF No. 18 at 27) is belied by the fact that several of them specifically state that they are "letter[s] of reference." Exhibits A, E, F. Thus, on their face, the very purpose of the letters was for some third party to rely on them. It is immaterial that the letters were not addressed to Metrocity. "[T]he law does not require that the false statement be made directly to the injured party, 'provided [that the statement is] made with the intent that it shall reach ... and be acted on by the injured party." *Kerruish v. Essex Holdings, Inc.*, No. 16-60877-CIV, 2017 WL 10457076, at *2 (S.D. Fla. Aug. 9, 2017) (quoting *Harrell v. Branson*, 344 So. 2d 604, 606 (Fla. Dist. Ct. App. 1977)). Here, the Complaint alleges that during Metrocity's March 5, 2019 phone call with a BOA representative, BOA confirmed that the March 2019 letter was authorized by Ms. Haralson "to be provided to [Wright Bros.] for [its] use with respect to prospective Trust Account Depositors like

16

[Metrocity]." ¶ 96. This allegation is sufficient to establish the third element of misrepresentation — intent to induce action.

BOA's third argument is that Counts I and III do not plausibly allege that BOA knew or should have known that the letters contained misrepresentations. Putting aside that a "footnote is an incorrect place for substantive arguments on the merits" (*Connor v. Midland Credit Mgmt., Inc.*, No. 18-23023-CIV, 2019 WL 717413, at *4, n.1 (S.D. Fla. Feb. 20, 2019)), I reject this argument. The Complaint pleads the following facts that, viewed in the light most favorable to Metrocity, demonstrate BOA knew or should have known that the letters contained misrepresentations:

- BOA checked the account balances as part of the process of drafting the letters

- Ms. Haralson changed the computational methodology

- BOA calculated the amounts wrong

- BOA reaffirmed, in the phone calls with Metrocity, that the numbers were accurate

*See, e.g.,* Complaint at ¶¶81-83, 90-93, 96, 100-102, 107, 108, 111.

For all these reasons, Counts I and III are adequately pled under both Rule 9 and Rule 12.

### *Negligence under §552 of the Restatement (Second) of Torts (Count II)*

Count II alleges a cause of action for Negligence under Section 552 of the Restatement (Second) of Torts (entitled Information Negligently Supplied for the Guidance of Others), which states as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977). Section 552 was adopted by the Florida Supreme Court in *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334 (Fla. 1997). Negligent misrepresentation under §552 of the Restatement is distinguishable from common law negligent misrepresentation in that it does not require an intent to deceive, "but only good faith coupled with negligence." *Todd Benjamin Int'l, Ltd. v. Grant Thornton Int'l, Ltd.*, No. 20-21808-CIV, 2023 WL 4457458, at *14 (S.D. Fla. July 11, 2023) (quoting *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 127 F.3d 1390, 1395 (11th Cir. 1997)).

 "[T]he central principle operating within Section 552 is that the defendant supplier of information must have a pecuniary interest in the transaction or context in which the information is supplied in order to merit the imposition of a duty of care in obtaining and communicating the information." *Blumstein v. Sports Immortals, Inc.*, 67 So. 3d 437, 441 (Fla. Dist. Ct. App. 2011) (citation omitted). "The fact that the information is given in the course of the defendant's business, profession or employment is a sufficient indication that he has a pecuniary interest in it, even though he receives no consideration for it at the time." *Id.* (quoting Restatement (Second) of Torts § 552 cmt. d.). Moreover, where

> the information is given in the capacity of one in the business of supplying such information, that care and diligence should be exercised

> which is compatible with the particular business or profession involved.
> Those who deal with such persons do so because of the advantages which
> they expect to derive from this special competence. The law, therefore,
> may well predicate on such a relationship, the duty of care to insure the
> accuracy and validity of the information.

*Blumstein*, 67 So. 3d at 441 (quoting 1 F. Harper & F. James, *The Law of Torts* § 7.6 (1956)).

Here, BOA issued the Balance Verification Letters on its letterhead and did so in the course of its business and in response to a customer's request. Ms. Haralson/BOA had a pecuniary interest in having Metrocity deposit millions of dollars into the bank and in maintaining its longstanding and profitable relationship with Wright Bros. This pecuniary interest gave rise to an accompanying duty of care in communicating accurate and truthful information to Metrocity.

BOA's only argument for dismissing Count II is that it owed no duty to Metrocity. ECF No. 18 at 28. BOA argues that a bank cannot be liable for "the improper conduct of others when the bank is only providing routine services to its customers, unaware of any fraudulent activity." ECF No. 18 at 28. The cases it cites are distinguishable.  For example, in *Lawrence v. Bank of Am., N.A.*, No. 8:09-CV-2162-T-33TGW, 2010 WL 3467501, at *4 (M.D. Fla. Aug. 30, 2010), the complaint merely alleged that the bank was familiar with its customer who conducted "atypical business transactions," making "exceptionally large deposits" which the bank allowed to be transferred to other accounts.  In *Wiand v. Wells Fargo Bank, N.A.*, 938 F. Supp. 2d 1238, 1245 (M.D. Fla. 2013), the complaint alleged that the bank allowed its customer to open accounts after providing inaccurate information, to open "shadow"

d/b/a accounts without proper authority, and to commingle large amounts of money between different types of accounts. The facts alleged in these cases describe passive conduct by the bank which was being used as an unknowing conduit to further a scheme. The facts in those cases stand in contrast to the affirmative steps BOA is alleged to have taken here in issuing reference letters that contained significant misrepresentations because the bank implemented a new method for calculating average monthly balances that masked large withdrawals, and then affirming the accuracy of those letters in subsequent phone calls.

BOA does not address that under Section 552, a pecuniary interest may be a sufficient basis for imposing a duty of care in supplying information. The Complaint alleges that BOA had a pecuniary interest in the transactions at issue and thus it owed Metrocity "a duty of full disclosure once it elected to volunteer specific factual information about the balance in the Trust Accounts, and the specific dollar amounts passing through the Trust Account, as well as information about Wright Brothers and its reputation and its banking and other history with Bank of America." *See* Complaint ¶ 154. I find these allegations sufficient for Count II to proceed.

### *Aiding and Abetting Claims (Counts IV-VI)*

In Florida, tort claims predicated on a theory of aiding and abetting fraud have three elements: (1) the existence of an underlying violation; (2) knowledge of the violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the violation by the alleged aider and abettor. *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012); *Chang*, 845 F.3d at 1097–

98 (citing *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Md.*, 917 So.2d 368, 72 (Fla. Dist. Ct. App. 2005)).[5]

"While the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud." *Todd Benjamin Int'l*, 2023 WL 4457458, at *15 (*quoting Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012), *aff'd sub nom. Lamm v. State St. Bank & Tr.*, 749 F.3d 938 (11th Cir. 2014)). "Conclusory statements that a defendant 'actually knew' [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant 'should have known that something was amiss.'" *Id.* (quoting *Platinum Estates, Inc. v. TD Bank, N.A.*, No. 11–60670–CIV, 2012 WL 760791, at *3 (S.D. Fla. Mar. 8, 2012)).

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Chang*, 845 F.3d at 1098 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)). "Because 'banks do have a duty to safeguard trust funds deposited with them when confronted with clear evidence indicating that those funds are being mishandled,' a bank's inaction—that is, its failure to stop the theft of such trust funds—can constitute substantial assistance."   *Id.* "[T]o establish that a bank

---

[5]   The Complaint alleges three separate claims for aiding and abetting (based on fraud, conversion and breach of fiduciary duty), but the parties agree that these claims can be analyzed together using the same legal standard. ECF No. 18 at n.6; ECF No. 29 at 27. *See also Lawrence*, 455 F. App'x at 906.

substantially assisted a fraudulent scheme to steal trust funds, knowledge of the underlying fraud "is the crucial element." *Chang*, 845 F.3d at 1098 (quoting *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006)).

Here, BOA claims that the Complaint's allegations are insufficient to establish that BOA had actual knowledge of the fraud or that it provided substantial assistance to advance the fraud. I reject these arguments and find that when viewed in the light most favorable to Metrocity, the aiding and abetting allegations are sufficient to prevail at this stage of the proceedings.

With regard to actual knowledge, *Chang* is instructive. In *Chang*, the bank's employee designated the account an escrow account even though it did not meet the bank's criteria, she accepted a payment for her "ongoing assistance in and cover up of [the] fraudulent scheme," and she issued a reference letter containing false account balance information. *Chang*, 845 F.3d at 1096-97. The Eleventh Circuit held that these facts were sufficient to show the bank's knowledge of a fraud involving a customer's escrow account. Even though the plaintiff in *Chang* did not explicitly allege that that the bank employee who opened and assisted with the account knew about the fraud, the Eleventh Circuit held that "such a direct allegation was unnecessary because [the allegations] support an inference that [the bank employee] knew that [the customer] was misappropriating money." *Chang*, 845 F.3d at 1097 (citing *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1297 (11th Cir. 2013) (recognizing that actual knowledge may be established through inference)). The bank employee's issuance of the letter "misrepresenting and overstating" the

balance in the escrow account after money had been removed from it, was a significant factor in the Court's determination that the banks' knowledge of the scheme could be inferred from this conduct. *Chang*, 845 F.3d at 1097.

*Chang*'s companion case, *Freeman v. JPMorgan Chase Bank N.A.*, is based on the same facts and there, the Eleventh Circuit again inferred the bank's actual knowledge of the fraud from the same bank employee's conduct (i.e., opening an escrow account that did not meet the bank's criteria, accepting a payment from the customer, and issuing a false letter of reference). The Court said, "If [the bank employee] was assisting [the customer] in his fraudulent scheme, it follows that she knew [the customer] was misappropriating money from the [ ] Escrow Account." *Freeman*, 675 F. App'x 926, 933-34 (11th Cir. 2017).[6]

The facts alleged in *Chang* and *Freeman* are comparable to those presented in the Complaint here. Although the allegations of the bank employee's complicity in the scheme were more involved in *Chang* and *Freeman*, the bank employee's issuance of a letter containing false account balance information in furtherance of the scheme was a vital part of the Court's finding of substantial assistance and provides a parallel to this case. As the Eleventh Circuit stated in *Chang*, this conduct cannot be dismissed as a "routine banking service[]." *Id.* at 1097.

Here, the Complaint alleges that the Balance Verification Letters prepared by Ms. Haralson represented a significant departure from the previous methodology

---

[6]  The Eleventh Circuit imputed the bank employee's knowledge to the bank, finding that their interests were not adverse. *Freeman*, 675 F. App'x. at 933.

BOA used in issuing those letters. In the previous letters, issued by Senior Vice President Fish, the average collected deposit balance was calculated based on the "average ledger balance" depicted on the Trust Account's monthly statements. ¶¶68-70, 74-75. By contrast, the letters issued by Ms. Haralson adopted a "new methodology . . . not tied to the average ledger balances" that "contradict[ed] [BOA's] own internal definition of the term 'collected balance'" and that served to "mask[] the large withdrawals from the account." ¶¶92, 92. Ms. Haralson repeated this process on multiple occasions, thus, grossly inflating the balance represented to be in the Trust Account over several years. In August 2019, this misrepresentation was an overstatement exceeding $28 million. ¶101. These misrepresentations were compounded by Ms. Haralson's verbal assurances that the information provided was accurate.

Viewing the facts in the Complaint in the light most favorable to Metrocity, there is a plausible inference that Ms. Haralson reviewed the Trust Account statements before issuing these letters and making verbal assurances. This inference is based on the Complaint's allegations that BOA's policies and applicable banking regulations required this review before issuing the letters. ¶109. Therefore, there is also a plausible inference that Ms. Haralson actually knew that the true average balances were significantly lower than what she was representing in her letters and that she knew most of the money that had been deposited into the Trust Account had actually been withdrawn. Metrocity need not allege that Ms. Haralson knew all the details of the scheme. The allegations in the Complaint are sufficient to plausibly

allege that Ms. Haralson actually knew money in the account was being misappropriated and that she knowingly issued false letters to cover up that fact.[7] Thus, the Complaint's allegations do more than merely suggest that BOA "should have known that something was amiss." *Lamm,* 889 F. Supp. 2d at 1332.

In the alternative, Metrocity argues that actual knowledge can be shown through willful blindness. ECF No. 29 at 30-31. BOA responds that Metrocity fails to cite any case where a bank has been found to aid and abet a customer's fraud under a willful blindness theory. ECF No. 34 at 14-15. BOA further argues that applying a willful blindness theory here would "have the practical effect of mooting the actual knowledge requirement, contrary to Florida law." *Id*. at 15.

Willful blindness is a viable theory of actual knowledge. Willful blindness is a way of proving actual knowledge, not a substitute for it. Willful blindness is a theory of circumstantial proof where actual knowledge is imputed "when a person has his or her suspicion aroused about a particular fact, realized its probability, but deliberately refrained from obtaining confirmation because he or she wanted to remain in ignorance." Florida Pattern Jury Instruction (Criminal) 3.3(h). This theory of circumstantial proof can be applied in civil cases. *See, e.g., Intel Corp. Inv. Pol'y Comm. v. Sulyma,* 140 S. Ct. 768, 779, 206 L. Ed. 2d 103 (2020) (citing *Global-Tech Appliances, Inc. v. SEB S. A.*, 563 U.S. 754 (2011)). And, it is axiomatic that there is no legal difference between direct or circumstantial evidence. *See, e.g.,* Eleventh

---

[7] "Under Florida law, knowledge an agent or employee acquires within the scope of her authority generally may be imputed to her principal or employer." *Chang*, 845 F.3d at 1095.

Circuit Pattern Jury Instruction (Civil) 3.3. BOA has not shown a reason why — or cited any authority holding that — willful blindness cannot be used to show actual knowledge in this case.

Here, the facts do not support a finding of willful blindness. Although there is a plausible inference that Ms. Haralson was on notice of suspicious activity in the Wright Bros. account, Metrocity's theory is that she affirmatively concealed this activity, not that she took steps to remain ignorant of it. Therefore, there is no plausible inference of willful blindness.

Finally, I find that the Complaint's allegations that Ms. Haralson knowingly concealed the Trust Account's actual balances and large withdrawals amounted to substantial assistance. *See Todd Benjamin Int'l*, 2023 WL 4457458, at *16 (allegations that defendants substantially assisted by preparing audit reports that omitted overvaluations and served to cover up the fraudulent scheme were sufficient to overcome motion to dismiss aiding and abetting claims). More than alleging simple inaction to suspicious activity by BOA, the Complaint details affirmative steps BOA took (via Ms. Haralson) that violated its "duty to safeguard trust funds deposited with them." *Chang*, 845 F.3d at 1098. BOA contends that it was not confronted with clear evidence indicating that the funds in the Trust Account were being mishandled; as discussed above, viewing the well-pled facts in the Complaint in the light most favorable to Metrocity, there is a plausible inference that Ms. Haralson acted with actual knowledge. *See* Complaint at ¶¶92, 93. Building on this fact, there is another plausible inference that Ms. Haralson changed the calculation methodology to conceal

the large withdrawals from the Trust Account and the fact that the Trust Account no longer held the escrow funds Metrocity had deposited for the purpose of prolonging a profitable customer relationship. For all these reasons, the Complaint plausibly alleges that BOA had actual knowledge of the fraud and rendered substantial assistance to it. Accordingly, the allegations are sufficient for the aiding and abetting claims in Counts IV-VI to proceed.

## **CONCLUSION**

Based on the foregoing, Defendant's Motion to Dismiss (ECF No. 18) is **DENIED.** Defendant shall file its Answer by **October 2, 2023.** The parties shall confer and submit a jointly proposed scheduling order.

**DONE and ORDERED** in Chambers at West Palm Beach, Palm Beach County, in the Southern District of Florida, this 18th day of September 2023.

_____
BRUCE E. REINHART
UNITED STATES MAGISTRATE JUDGE